EMPRESA LINEAS MARITIMAS AR-
GENTINAS S.A. as Owner of the Motor
Vessel SANTA CRUZ II, Appellee,

v.

UNITED STATES of America,
Appellant.

No. 82–1867.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 1, 1983.

Decided March 21, 1984.

David V. Hutchinson, Sr. Admiralty Counsel, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., J. Frederick Motz, U.S. Atty., Baltimore, Md., on brief), for appellant.

Kieron F. Quinn, Baltimore, Md. (M. Hamilton Whitman, Jr., Ober, Grimes, & Shriver, Baltimore, Md., on brief), for appellee.

Before WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

The United States appeals from an order denying its claim for limitation of liability under 46 U.S.C. § 183(a) (1958). We affirm the judgment of the district court.

## I

This suit arises out of a collision between the United States Coast Guard Cutter Cuyahoga and the Argentinian freighter, Santa Cruz II. How the collision occurred is undisputed. On a clear night in October 1978, the Cuyahoga, under the command of Chief Warrant Officer Donald K. Robinson, was northbound in the Chesapeake Bay on an officer candidate training cruise from its base at the Coast Guard Reserve Training Center (RTC) in Yorktown, Virginia. The Santa Cruz II, a freighter loaded with coal, was southbound in the Bay from Baltimore, Maryland.

While standing watch on the Cuyahoga, Captain Robinson and several officer candidates noticed the lights of a vessel, which turned out to be the Santa Cruz II, off the port bow. Captain Robinson checked the radar and determined that the vessel was about eight miles away and had a left-bearing drift. From the configuration of the lights, Captain Robinson, despite many years of experience, guessed erroneously that the Santa Cruz II was a small vessel traveling in the same direction as the Cuyahoga. When the vessels were about a mile apart, Captain Robinson ordered a change of course, turning left to take the Cuyahoga into the mouth of the Potomac River to moor for the night. Having erroneously concluded that the Cuyahoga and the Santa Cruz were traveling in the same direction, Captain Robinson thought that by turning left the Cuyahoga would cross astern of the Santa Cruz. In fact, the left turn caused the Cuyahoga to cross the bow of the Santa Cruz II. When the Cuyahoga crossed its path, the Santa Cruz II sounded its warning signals. Captain Robinson did not realize that his vessel was in the path of the Santa Cruz until it was too late. The bow of the Santa Cruz struck the Cuyahoga. The Cuyahoga sank in two to three minutes. Eleven of her crew died. The Santa Cruz II sustained substantial injury to her bow.

## II

Empresa Lineas Maritimas Argentinas, SA (ELMA), the owner of the Santa Cruz

II, filed a complaint against the United States seeking recovery for damages to the Santa Cruz II and for indemnity and contribution for any claims arising out of the accident for which ELMA might be held liable to third parties.[1] The United States denied liability but asserted that, in the event that it was found liable, its liability should be limited under 46 U.S.C. § 183(a) to the value of the Cuyahoga, which is nothing.

In a memorandum opinion, Judge Blair found that the multiple errors of judgment and perception made by Captain Robinson were the sole cause of the collision. Consequently, the United States was 100% liable. The court also held that the government was entitled to limit its liability under § 183(a) because the United States did not have privity or knowledge of the cause of the collision.

Before judgment was entered, Judge Blair died. The case was reassigned to Judge Thomsen. Upon motion of ELMA, which the government opposed, Judge Thomsen reopened the case and held another trial at which additional evidence was received and new witnesses heard. Judge Thomsen agreed with Judge Blair's conclusion that the Cuyahoga was solely responsible for the collision. Judge Thomsen, however, held that the United States could not limit its liability under § 183(a) because "one or more persons in the chain of command over Robinson had knowledge or were charged with knowledge of the existence of Robinson's physical problems and loss of sleep, which were responsible for his bad judgment, the cause of the collision." It is from this judgment that the United States appeals.

### III

■ Under 46 U.S.C. § 183(a) the liability of a shipowner for any loss, damage, or injury by collision may not exceed the amount or value of the interest of the owner in the vessel if the loss is occasioned without the privity or knowledge of the owner. Determining whether a shipowner may limit liability under this section is a two-step process. First, the court must consider what acts of negligence or conditions of unseaworthiness caused the accident. Here, the United States does not appeal the district court's finding that Captain Robinson's errors of judgment due to his physical condition caused the collision. Consequently, we must address only the second question, whether the shipowner had knowledge of the events which caused the loss.

■ To preclude limitation under § 183(a), the shipowner's knowledge need not be actual. The shipowner is chargeable with knowledge of acts or events or conditions of unseaworthiness that could have been discovered through reasonable diligence. *See Spencer Kellogg Co. v. Hicks,* 285 U.S. 502, 511–12, 52 S.Ct. 450, 452–53, 76 L.Ed. 903 (1932). Thus, the inquiry here is whether the United States had sufficient knowledge of Robinson's medical condition, which the district court found caused his errors in judgment, so that limitation of liability should be denied.

■ The same standards are applicable to the United States when it seeks a limitation of liability because it lacked privity or knowledge of the cause of the loss as when a private corporation seeks the same benefit. *United States v. Standard Oil of California,* 495 F.2d 911, 917 (9th Cir. 1974). In both instances, liability may not be limited under § 183(a), where the negligence is that of an executive officer, manager, or superintendent, whose scope of authority includes supervision over the phase of the business out of which the injury occurred. *Coryell v. Phipps,* 317 U.S. 406, 410–11, 63 S.Ct. 291, 293–94, 87 L.Ed. 363 (1943) (dicta). Here, the record shows that three officers were above Captain Robinson in the chain of command at Yorktown. The authority of the command-

---

1. Personal representatives of Coast Guard crewmen who died and Coast Guard crewmen who were injured in the collision have filed 11 suits against ELMA in the district court of Massachusetts.

ing officer of the Reserve Training Center in Yorktown included the operational control of the Cuyahoga. Below him in the chain of command was the executive officer. Finally, Captain Robinson's reporting officer was the chief of the training division at Yorktown. As head of the training division, he had operational and administrative control of the Cuyahoga. Each of these officers had sufficient authority over the operation of the Cuyahoga to impute to the United States his knowledge of the events that caused the accident. *See Spencer Kellogg Co.*, 285 U.S. at 511, 52 S.Ct. at 452.

## IV

■ The United States argues that it cannot be charged with privity or knowledge of Robinson's errors of navigation and seamanship when the vessel is underway. *See La Bourgogne*, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973 (1908). Nonetheless, the United States may not absolve itself if through the use of reasonable diligence it could have taken action while the vessel was in port and under its authority and control that would have prevented Robinson's negligent acts at sea. *Spencer Kellogg Co.*, 285 U.S. at 511–12, 52 S.Ct. at 452–53; *States Steamship Co. v. United States*, 259 F.2d 458, 474 (9th Cir.1957). We turn then to consider whether Robinson's superiors exercised reasonable diligence to ascertain the effect Robinson's medical condition might have on his performance as commanding officer of the Cuyahoga.

Robinson first visited the medical clinic at the RTC in Yorktown in April 1978 complaining of wheezing, coughing, and shortness of breath. Initially, he was treated by corpsmen at the medical clinic who apparently diagnosed his condition as a sinus infection and prescribed anithistamines and a cough expectorant. Robinson returned to the medical clinic several times over the next few months because his symptoms persisted. Sometimes he was seen by a doctor, at others by a physician's associate or corpsman. From July to September he visited the clinic frequently, going two to three times a week for treatment. During this period he was treated by a doctor who had diagnosed Robinson's illness as bronchial asthma. Robinson repeatedly complained to the doctor that his coughing and difficulty in breathing were affecting his sleep. Some nights he said he slept only two to three hours. The doctor's testimony conflicted with Robinson's. The doctor admitted Robinson told him about difficulty in resting. He denied that he had any discussion about lack of sleep, and he asserted that he did not think Robinson was unfit for duty.

Robinson's condition did not improve materially, so in September the doctor sent him to the allergy clinic at Walter Reed Hospital. Robinson visited the allergy clinic at Walter Reed three times between September 14 and October 20, 1978. During this period he saw the doctor at the Yorktown clinic only on an informal basis, keeping him apprised of his progress and treatment at Walter Reed. His last visit to Walter Reed was the day before the collision, at which time he still complained of coughing, wheezing, chest congestion, and sleeplessness. Because Robinson's condition had not improved, his physician at the allergy clinic arranged for him to go to the pulmonary clinic for further testing. Robinson's illness was not correctly diagnosed as aspergillosis until after the accident, in December 1978.

The medical clinic at Yorktown documented most visits on a daily medical report that was circulated to the commanding and executive officers. It listed patients seen at the clinic, their diagnosis, and a fitness-for-duty determination made by medical personnel. The district court found that although Robinson's superiors knew his name was appearing frequently on this list, they took no reasonably adequate steps to determine whether his medical condition affected his ability to perform his duties as the commanding officer of the training vessel Cuyahoga.

The government argues that Robinson's superiors exercised due diligence and con-

cluded that his condition would not impair the performance of his duties. The executive officer asked the doctor at Yorktown about Robinson and he also asked Robinson on at least one occasion how he was feeling. To require more, the United States argues, places an impossible burden on Robinson's superiors.

The executive officer testified that he noticed Robinson's name on the daily medical report several days in a row in July 1978. He testified, however, that his conversation with the doctor, which the United States asserts constitutes sufficient diligence, was for a limited purpose. He questioned the doctor because he could not decipher the notation of Robinson's diagnosis on the daily medical report. He did not ask medical personnel whether Robinson's condition in any way affected his ability to perform as the commanding officer of the Cuyahoga. Moreover, although the executive officer notified the commanding officer that Robinson's name was appearing frequently on the daily medical report, neither officer initiated any action or made any inquiry concerning the necessity of sick leave for Robinson or relief from his command. The chief of the training division made no attempt to determine the extent of Robinson's illness, although, as Judge Thomsen found, he, too, had knowledge that Robinson had been ill for some time.

The United States argues that to require Robinson's superiors to conclude that he should not perform his duties as commanding officer when the doctors at Yorktown and Walter Reed had not recommended that he be removed from duty is to hold the United States to a standard of omniscience. The government relies on the doctor's testimony that had he thought Robinson was too ill for duty he would have insisted that Robinson stay home in a not-fit-for-duty status.

Conflicting evidence undermines the government's reliance on the doctor's testimony. Medical personnel at the RTC generally did not place senior officers like Robinson on limited or not-fit-for-duty status because senior officers could determine their own duty status. Consequently, a senior officer often would not be put on not-fit-for-duty status under circumstances where an enlisted man would be. Indeed, the doctor testified at Robinson's court martial that he would have put Robinson on not-fit-for-duty status on several occasions had Robinson been an enlisted man on the Cuyahoga.

Robinson, however, did not know that he could declare himself not-fit-for-duty for medical reasons, nor did he feel that he was incapable of performing his duties. He was confident that if he were unfit, the medical officers would tell him. Robinson believed that because his superiors received the daily medical report and thus were aware of his condition, they would relieve him of his duty if they thought it was necessary. Unfortunately, Robinson's superiors considered senior officers listed on the daily medical report fit-for-duty unless medical personnel or the individual recommended otherwise. Consequently, they did not suggest independently that Robinson may not be fit-for-duty.

■ That the policy was unclear for declaring senior officers not-fit-for-duty does not absolve the United States. Knowledge within the context of § 183(a) includes both actual knowledge and the knowledge of conditions likely to produce or contribute to loss which the owner or superintendent could have discovered through reasonable diligence. "The measure in such cases is not what the owner knows, but what he is charged with finding out." *States Steamship Co.*, 259 F.2d at 466 (quoting *Great A & P Tea Co. v. Brasileiro*, 159 F.2d 661, 665 (2d Cir.1947). The executive officer's limited questioning of the doctor did not meet this standard. The Coast Guard officers whose authority included the operational command of the Cuyahoga had a duty to conduct a more probing inquiry to determine whether Robinson's condition might affect his ability to perform as the commanding officer on training missions on the Cuyahoga. Failing in this duty, the United States may not limit its liability

under § 183(a). *See Spencer Kellogg Co.* 285 U.S. at 512, 52 S.Ct. at 453.

## V

Other considerations support the district court's finding that the United States had privity and knowledge. Robinson had been involved in two minor accidents in April and May of 1978. After investigating these accidents, the Coast Guard reprimanded Robinson for exercising poor judgment. The government argues that these accidents bore no relationship to Robinson's competence. Nonetheless, we agree with the district court's observation that, although these accidents do not compel the conclusion that Robinson was incompetent, they are factors that in conjunction with Robinson's medical problems should have prompted Robinson's superiors to investigate whether he was fit to perform full duty.

■ ELMA also asserts that independent grounds support a denial of limitation of liability. First, ELMA argues that the Cuyahoga was not sufficiently manned with a competent crew. ELMA presented as evidence three Coast Guard district inspection reports, from 1973, 1975, and 1978, which concluded that the Cuyahoga was undermanned and recommended an increased personnel allowance. Additionally, ELMA introduced a letter written by Robinson to the Commandant of the Coast Guard requesting an electrician billet for the Cuyahoga. In his letter Robinson explained that the personnel allowance was "far below the level of the necessary manpower needed to maintain this class and size of vessel, provide the routine administration, watchstanders and furnish qualified instructors for the training of the officer candidates ...." The district court found, however, that Robinson's errors of judgment, not undermanning or an incompetent crew, caused the damage to the Santa Cruz.[2] We cannot say that this finding is clearly erroneous.

■ ELMA also asserts that the Coast Guard had knowledge of material deficiencies on the Cuyahoga, including inadequate radar and emergency lighting, and poor watertight integrity, that were sufficient to deny limitation. The district court found that material deficiencies did not cause or contribute to the damage to the Santa Cruz but that they would be important with respect to 46 U.S.C. § 183(e), the loss of life provisions of the statute, if ELMA were held liable for damages in the Massachusetts cases. This finding also is not clearly erroneous, and we will not disturb it on review.

■ We turn finally to ELMA's claim for indemnity and contribution. Like the district court, we find this claim is premature because no judgment for damages has been rendered against ELMA in the wrongful death and personal injury suits filed in Massachusetts.

We conclude that Judge Thomsen's findings are not clearly erroneous and that he correctly applied the legal principles that govern this suit. Accordingly, we hold that the United States may not limit its liability under 46 U.S.C. § 183(a) because it had privity and knowledge of the conditions that caused the collision between the Cuyahoga and the Santa Cruz. The judgment of the district court is affirmed.

---

**2.** The district court reserved judgment on the issue of whether the crew was undermanned or incompetent until it was necessary to make a decision on whether ELMA was entitled to indemnity or contribution for damages recovered from ELMA in the suits pending in Massachusetts.