In the Matter of the Complaint of the NATIONAL SHIPPING COMPANY OF SAUDI ARABIA, as Owner, and Mideast Ship Management Limited, as Operator, of the M/V Saudi Riyadh For Exoneration from or Limitation of Liability.

Civ.A. No. 2:99CV223.

United States District Court,
E.D. Virginia,
Norfolk Division.

June 21, 2000.

428

Carter T. Gunn, Edward James Powers, Vandeventer Black LLP, Norfolk, VA, Wayne D. Meehan, Freehill, Hogan & Mahar, New York City, for National Shipping Co. of Saudi Arabia.

Michael Anson Rhine, U.S. Attorney's Office, Norfolk, VA, Peter F. Frost, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, for U.S.

## OPINION

REBECCA BEACH SMITH, District Judge.

This admiralty action arises out of the February 4, 1999, collision between the U.S.S. ARTHUR W. RADFORD and the M/V SAUDI RIYADH. The National Shipping Company of Saudi Arabia ("NSCSA"), as owner, and Mideast Ship Management Limited ("Mideast"), as operator, of the vessel filed a complaint for exoneration from or limitation of liability, pursuant to 46 U.S.C.App. § 183(a) (West 1994). The United States and eight personal injury claimants [1] subsequently filed claims against the limitation plaintiffs for damages arising from the collision. The limitation plaintiffs counterclaimed against the United States for damages sustained by the M/V SAUDI RIYADH during the collision and for contribution and/or indem-

---

1. All of the personal injury claimants settled their claims with the limitation plaintiffs.

nity for any amounts paid in satisfaction of other claims arising from the collision. The case was tried to the court without a jury. Both parties have submitted post-trial proposed findings of fact and conclusions of law, and the case is now ripe for decision on the issues of liability.

## I. *Legal Standards*

After over two weeks of trial, it remains inconceivable to the court that two large ships, both properly equipped with radar and properly lighted, collided in the open ocean on a clear night, with no other ship traffic in the vicinity restricting their maneuverability or visibility. Nonetheless, such a collision did occur, and the court must now assess the credible evidence before it, allocate the fault, and determine issues of liability and limitation.

 Limitation of liability proceedings require a bifurcated analysis. *See Empresa Lineas Maritimas Argentinas S.A. v. United States,* 730 F.2d 153, 155 (4th Cir.1984). First, the court must determine what acts of negligence caused the collision. *See id.* Liability for maritime collisions is allocated proportionately to the comparative degree of fault. *See United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). If the court determines that some negligence of the ship owned by limitation plaintiffs proximately caused the collision, the court must proceed to determine whether the limitation plaintiffs are entitled to limit their liability for that negligence pursuant to 46 U.S.C.App. § 183(a). *See Empresa Lineas Maritimas Argentinas S.A.,* 730 F.2d at 155. Although the claimant bears the burden of proving negligence, the limitation plaintiffs bear the burden of establishing their entitlement to limit liability. *See Coryell v. Phipps,* 317

U.S. 406, 411, 63 S.Ct. 291, 87 L.Ed. 363 (1943).

 As an admiralty action, this case arises under the court's civil admiralty and maritime jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1333 (West 1994), and is governed by the preponderance of the evidence standard. *See Lilienthal's Tobacco v. United States,* 97 U.S. 237, 266, 24 L.Ed. 901 (1877). Thus, pursuant to Fed. R.Civ.P. 52(a), the court makes the following findings of fact and resulting conclusions of law, based upon the preponderance of the credible evidence.

## II. *Liability*

### A. *Findings of Fact*

*Background*

1. At approximately 2335[2] on February 4, 1999, the U.S.S. ARTHUR W. RADFORD ("RADFORD") and the M/V SAUDI RIYADH ("SAUDI RIYADH") collided approximately 17.5 miles east of Cape Henry, Virginia, in the Atlantic Ocean. The night was clear, and visibility was essentially unlimited.

2. The RADFORD is a Spruance class destroyer commissioned by the United States Navy on April 16, 1977. The RADFORD is 563 feet in length with a beam of 55 feet, a mean draft of 30.5 feet, and a displacement of approximately 8,400 tons. The RADFORD is highly maneuverable and capable of reaching a complete stop within one ship's length.

3. On the night of the collision, the RADFORD was conducting electronic warfare equipment calibration, which involved the ship steaming steadily in a circle at approximately 15 knots on a 1 mile radius from a Navy special purpose buoy located about 17 miles off the coast of Virginia.

---

**2.** All time references herein are based on the twenty-four hour military clock.

4. The special purpose buoy is located east of the entrance beacon for the Chesapeake Bay and is marked "Navy" on Chart 12221, a navigational chart of the Chesapeake Bay entrance that was used onboard the SAUDI RIYADH on the night of the collision. The buoy flashes with a yellow light, indicating that it is a "special purpose" buoy.

5. The RADFORD made a complete calibration circle around the buoy approximately every thirty minutes. At the time of the collision, the RADFORD had been circling the buoy for approximately six hours.

6. The SAUDI RIYADH is a documented vessel of the Kingdom of Saudi Arabia, International Maritime Organization ("IMO") No. 7900053, of steel construction, self-propelled and manned, of 29,259 gross registered tons, 656.10 feet in length, and 104.01 feet in breadth.

7. On February 4, 1999, the SAUDI RIYADH was headed southbound from New York along the East Coast to arrive at Cape Henry, take a Maryland harbor pilot, and then proceed up the Chesapeake Bay to Baltimore.

8. The SAUDI RIYADH had marked her course to turn into the Chesapeake Bay and approached the buoy area from the northeast, making about 17.7 knots.

*Navigation of the SAUDI RIYADH*

9. Third Mate Manuel Tolosa was conning the SAUDI RIYADH at the time of the collision. Tolosa arrived on the bridge to stand his evening watch at approximately 1955. At 2022, Tolosa changed course from 208 degrees to 231 degrees. The vessel was on automatic pilot.

10. At 2100, Tolosa tested all navigational equipment in preparation for arrival at Cape Henry. All equipment was operational.

11. The SAUDI RIYADH is equipped with a conventional Kelvin Hughes radar and a Sperry Automatic Radar Plotting Aid ("ARPA") radar. While the conventional radar displays only raw radar data, the ARPA radar is a computer capable of several specialized functions. The ARPA radar automatically plots targets, figuring course and speed and predicting their closest point of approach ("CPA") to its own ship. The ARPA radar is further capable of providing graphical representations of a radar target's historical movements, called "history dots." The Sperry ARPA also has one unique feature, not found in other ARPA radars. It is capable of depicting a predicted area of danger ("PAD") around the target, which provides watch officers with an outline of the area in which the vessel would risk a close quarters situation with a target.

12. Although both the Kelvin Hughes and Sperry ARPA radars remained on through the time of the collision, Tolosa utilized neither the "history dots" nor the "PAD" function.

13. Sometime prior to 2300, Tolosa called the Maryland harbor pilots on the SAUDI RIYADH's Very High Frequency ("VHF") bridge-to-bridge radio, providing the SAUDI RIYADH's estimated time of arrival at the pilot station. The pilots advised that the vessel was scheduled to dock on arrival and instructed Tolosa to stand by on channel 14, which was the frequency used by the Maryland pilots.

14. At a range of about 11 miles, at approximately 2300, the SAUDI RIYADH's lookout, Able-bodied Seaman ("A/B") Rolando Doron spotted the RADFORD on the SAUDI RIYADH's port bow. A/B Doron could see the RADFORD's "range light" and both her red (port) and green (starboard) side lights.

15. A/B Doron brought the contact to the attention of Tolosa, who then attempt-

ed to acquire it on his ARPA radar. The ARPA could not maintain a track at that distance.

16. A/B Doron continued to visually monitor the RADFORD and noticed that she was turning left, crossing the SAUDI RIYADH's bow, and then continuing to turn until the two ships appeared to be on nearly the same course. He could tell that the RADFORD was continuing to turn because he first saw both side lights, then just her green starboard light, then just her white stern light.

17. At a range of 8 to 9 miles, at approximately 2307, Tolosa succeeded in locating the RADFORD on his ARPA radar and began to track her movements automatically.

18. From this time until the collision, the RADFORD was continuously displayed and tracked by the ARPA radar, and the RADFORD's lights, though changing as she turned around the Navy buoy, were always physically visible to Tolosa and A/B Doron.

19. At approximately 2320, Tolosa sent his lookout below to wake another watchstander.

20. While A/B Doron was below, Tolosa went into the chart room on the bridge, fixed the vessel's position, and changed charts to the smaller chart covering the entrance to the Chesapeake Bay. He also called the ship master and the engine room to notify them that arrival would be in approximately one hour.

21. When Tolosa and A/B Doron returned to the bridge, the RADFORD was on the SAUDI RIYADH's starboard bow, showing only her white stern light.

22. At approximately 2323, both Tolosa and A/B Doron saw the RADFORD's red side light, indicating that the RADFORD was continuing to turn.

23. At approximately 2325, the ARPA radar showed the RADFORD was 4.5 miles away, still on the SAUDI RIYADH's starboard bow, but crossing from starboard to port.

24. From the credible expert testimony, the court finds that at 2325, at a range of 4.5 miles, with RADFORD positioned to cross SAUDI RIYADH's bow from starboard to port, it was no longer clearly safe for the SAUDI RIYADH to continue on its course, and a risk of collision arose.

25. At that time, Tolosa attempted to contact the RADFORD on the VHF bridge-to-bridge radio. The recognized international calling frequency is channel 16. However, Tolosa made this call on channel 14, the pilot frequency, because Tolosa assumed from his observation of the RADFORD, that the RADFORD was delaying arrival at the pilot station to pick up a pilot. Therefore, he believed that the RADFORD would be standing by on channel 14, as the SAUDI RIYADH had been instructed to do, awaiting clearance from the pilot station. Tolosa received no response from the RADFORD.

26. At 2329, the RADFORD was still slightly on the SAUDI RIYADH's starboard bow.

27. Tolosa attempted a second call to the RADFORD in an effort to determine the RADFORD's intentions. Again, however, Tolosa placed this call on channel 14 and received no response from the RADFORD.

28. At a range of about 2.6 miles, the ARPA radar located the RADFORD now crossing very closely to the SAUDI RIYADH's port bow with a predicted CPA of 0.6 mile.

29. IMO accuracy standards for ARPA radars require only that their CPA predictions be accurate to within 0.7 of a mile. An ARPA predicted CPA of 0.6 mile could,

therefore, indicate a collision prediction. The court finds from the credible expert testimony that a competent ARPA operator should be familiar with these accuracy standards and take them into consideration when evaluating a developing situation.

30. Tolosa was not familiar with these standards and did not take them into account when evaluating the developing close quarters situation with the RADFORD.

31. Between 2329 and 2330, Tolosa made two slight alterations of course to starboard, changing his course from 231 degrees to 237 degrees, and ultimately steadying at 240 degrees. Tolosa believed that this alteration created a safe passing distance between the two ships. However, these minor course changes were not, in fact, broad enough to avert the risk of collision.

32. Between 2332 and 2333 both the red and green sidelights of the RADFORD again became visible, clearly indicating that the RADFORD was continuing its turn to port.

33. As both sidelights became visible, Tolosa attempted a third radio contact with the RADFORD, this time on the recognized international frequency, channel 16. His call did not identify the RADFORD by geographical position, but merely stated, "vessel off my port bow, please keep clear of me. You are only 1 mile from me. You are on my port bow now."

34. From the credible expert testimony, the court finds that a proper VHF radio call to another vessel would typically identify the other vessel by its geographic position, either using latitude or longitude or relationship to a landmark.

35. Tolosa's repeated radio calls to the RADFORD evidence that Tolosa was in substantial doubt regarding the actions and intentions of the RADFORD. Mideast's navigational guidelines require a watch officer to call his ship's master when the officer is in doubt about another vessel's actions. At no time prior to the collision did Tolosa call the master of the SAUDI RIYADH. Tolosa also did not sound any whistles to reflect his concern.

36. The SAUDI RIYADH continued at full speed into the RADFORD's circle.

37. The PAD function of the Sperry ARPA radar, if used, would have shown that the SAUDI RIYADH, by maintaining her course, was proceeding into a predicted area of danger.

38. The ARPA's history dots would have displayed the RADFORD's steady circular track for at least twenty-eight minutes prior to the accident and would have displayed the Navy buoy in the center of that circle.

39. From the credible expert testimony, the court finds that a competent watch officer utilizing all of the SAUDI RIYADH's navigational equipment would have recognized that the RADFORD was maneuvering in a constant, steady circle and that the SAUDI RIYADH was proceeding directly into the RADFORD's predictable path.

40. Without utilizing all of the navigational capabilities onboard the SAUDI RIYADH, it is clear from Tolosa's actions that he failed to comprehend the developing situation that was conveyed by the radar and the constant changing of the RADFORD's light configuration.

41. After placing his third unsuccessful radio call, and just moments before the collision, Tolosa observed the RADFORD's lights change position again so that only her green light was visible as she continued her turn to port across the bow of the SAUDI RIYADH. Not until Tolosa observed this final change in the RADFORD's light configuration did he recog-

nize that his ship's course proceeded directly into the path of the RADFORD.

42. There were no other vessels within several miles of the RADFORD and the SAUDI RIYADH, and neither ship was restricted in its maneuverability. It was a clear night, with no restrictions on visibility.

43. Tolosa ordered the vessel's rudder hard to starboard and sounded the danger signal.

44. At no time did the SAUDI RIYADH reduce her speed.

45. At the time of the collision, the RADFORD's heading was due north, 000 degrees. The credible expert testimony before the court establishes that the ships collided at an angle of approximately 78 degrees, indicating that the SAUDI RIYADH was on a heading of 258 degrees true at the time of the collision. She had only changed course 18 degrees from the time her rudder was put hard over until the time of the collision.

46. Given the maneuvering characteristics of the SAUDI RIYADH, as indicated on both the ship's own maneuvering characteristics diagram and explained through credible expert testimony, a course change of 18 degrees at the SAUDI RIYADH's speed of 17.7 knots indicates that the rudder was not put over until the SAUDI RIYADH was within approximately 170 meters and twenty to thirty seconds of collision.

47. Similarly, the credible eyewitness testimony and the totality of the circumstances of the collision indicate that no danger whistles were sounded until seconds before the collision.

48. The vessels collided at approximately 2335.

*Navigation of the RADFORD*

49. Throughout her maneuver around the Navy buoy on the night of February 4, 1999, the RADFORD maintained a steady and predictable turn. For the thirty-five minute period prior to the collision, the RADFORD maintained an average rate of turn of 13 degrees per minute, making more than one complete circle around the buoy. The RADFORD had not appreciably varied its speed during that period and never steadied on any given course or "flattened" its turn.

50. The Navy did not shine a light on the buoy to indicate that it was restricted in its maneuvering or to attract the attention of other vessel traffic because it would have been impermissible under the navigational rules for the Navy to have used light signals in this way.[3]

51. As the RADFORD turned around the buoy, watchstanders in the vessels's Combat Information Center ("CIC") were tracking the SAUDI RIYADH's approach to their ship's circle on radar. It is the responsibility of CIC to track and plot all contacts and make recommendations to the officer of the deck ("OOD") on the bridge as necessary for safe navigation.

52. The surface tracker in CIC monitors contacts on the RADFORD's radar system. Operations Specialist Third Class ("OS3") Deborah Hattings was the surface tracker at the time of and leading up to the collision.

53. The SAUDI RIYADH appeared on the RADFORD's radar at 2310 with a range of 14,700 yards and a CPA of 8,800

---

**3.** The court concurs with the credible expert testimony that such use of light signals would have been impermissible under Rules 27 and 36 of the International Regulations for the Prevention of Collisions at Sea, 33 U.S.C. § 1602 (West 1994).

yards, and was designated by OS3 Hattings as "Skunk AG." [4]

54. The CIC watch supervisor and CIC watch officer are required to be notified when the CPA is less than 10,000 yards with a range of 15,000 yards or less. This was not done.

55. Utilizing radar contact data communicated by the surface tracker, a graphic representation of the SAUDI RIYADH's true movements was kept on the RADFORD's Dead Reckoning Tracer ("DRT").

56. The DRT is a manually maintained true plot that is produced by having a watchstander mark in pencil reported vessel contacts' ranges and bearings from the own ship's position. The own ship's position is indicated by the center of a lighted circle that is slaved to the own ship's gyrocompass and pit log, which senses speed through the water. The own ship's position is called the "bug." When the ship is moving, the bug moves in the same direction and speed, to scale, that the ship moves. When the DRT plotter plots radar contacts' ranges and bearings from the bug, he is plotting their true movements, to the same scale that his own ship's movements are represented on the DRT.

57. OS3 Andrew Chow was operating the DRT at the time of and leading up to the collision. Utilizing an open communication circuit known as the "JL circuit," OS3 Chow called for radar data from the surface tracker and plotted it on the DRT.

58. The DRT showed the SAUDI RIYADH approaching the RADFORD's circle on a straight course at a steady speed. The CIC watchstanders on duty, however, did not appreciate the danger of that approach to their circle and did not commu-

nicate it to their watch officer or watch supervisor in CIC. The watch officer and watch supervisor were unaware of the threat posed by the SAUDI RIYADH's approach.

59. The surface tracker also communicated the contact data to other watchstanders using the JL circuit. The surface tracker, the DRT plotter, the status board keeper on the bridge, and the bow and stern lookouts were all linked through the JL circuit so that each watchstander could hear contacts communicated over the circuit.

60. Seaman ("SN") Edwin Rohm, Jr. was the status board keeper on the bridge on the night of the collision. It was his duty to write the contact data communicated through the JL circuit by the surface tracker in CIC on a lighted status board to which the OOD could refer for information about other ships in his area.

61. When contact data was passed to the bridge status board keeper by way of the JL circuit, he was supposed to call them out loudly enough so that the OOD heard him and acknowledged receipt of the information.

62. SN Rohm's reports regarding the approach of the SAUDI RIYADH, however, were not heard or acknowledged by the RADFORD's OOD.

63. The RADFORD crew on the bridge heard no warnings regarding the SAUDI RIYADH's proximity to the RADFORD and, preoccupied by the calibration maneuver, did not check the status board or visually observe the SAUDI RIYADH's approach.

64. Although the RADFORD's Commanding Officer Daniel W. Chang's stand-

---

**4.** "Skunk" is the term used by U.S. Navy vessels to designate unknown surface contacts.

ing orders required that all contacts with a CPA of 15,000 yards or less be reported directly to him, Commander Chang, who was not on the bridge during the time leading up to the collision, was never notified of the SAUDI RIYADH's approach by any crew member prior to the collision.

65. The United States stipulated that the RADFORD's crew was not maintaining a proper lookout.

66. Watchstanders on the RADFORD's bridge did not become aware of the SAUDI RIYADH's proximity to their own vessel until they saw the ship closing on the RADFORD just seconds before the collision.

67. The RADFORD's conning officer, Ensign ("ENS") Lars T. Bjorn, and the officer of the deck, Lieutenant Junior Grade ("LTJG") David T. Mattox, simultaneously on sighting the SAUDI RIYADH close aboard, ordered "all stop, all back full, left full rudder." This was the proper order to obtain the maximum and most immediate turn away and stop, but the order came too late.

68. RADFORD's officer of the deck, conning officer, bridge status board keeper, and forward lookout all saw the SAUDI RIYADH, and avoidance maneuvering was underway onboard the RADFORD, before the SAUDI RIYADH sounded any danger signals.

69. If the RADFORD's watch officers on the bridge had been alerted to SAUDI RIYADH's presence earlier, the RADFORD's maneuvering characteristics would have allowed her to stop within one ship's length to avoid the collision.

B. *Conclusions of Law*

*Background*

1. At all relevant times, the navigation of both vessels was governed by the International Regulations for the Prevention of Collisions at Sea, 33 U.S.C. § 1602 (West 1994) [hereinafter "COLREGS"], and both vessels were power-driven vessels within the meaning of the COLREGS, Rule 3.

█ 2. "[A] vessel which violates a statutory duty of the road [must] prove that the violation could not have contributed to the collision to avoid liability." *Yarmouth Sea Products Ltd. v. Scully*, 131 F.3d 389, 394 (4th Cir.1997).

█ 3. "Rules of navigation are obligatory upon vessels approaching each other from the time the necessity for precaution begins, and they continue to be obligatory as the vessels advance, so long as the means and opportunity to avoid the danger remain." *The Johnson*, 9 Wall. 146, 76 U.S. 146, 153, 19 L.Ed. 610 (1869).

█ 4. The question of when the need for precaution arises "is to be determined by objective standards; the fact that a vessel under scrutiny did not perceive the need for care matters not at all." *Ocean Marine Ltd. v. United States Lines Co.*, 300 F.2d 496, 498 (2d Cir.1962).

█ 5. It must also be remembered that "it is the risk of collision, not [just] the collision itself, that masters must avoid." *Esso Standard Oil Co. v. Oil Screw Tug Maluco I*, 332 F.2d 211, 214 (4th Cir.1964) (citing *Ocean S.S. Co. of Savannah v. United States*, 38 F.2d 782, 784 (2d Cir.1930)).

█ 6. "Since the rules are designed to prevent the risk of collision as well as collision itself, it is not necessary for a collision to be imminent or even probable before the obligation imposed by them accrues .... '[T]here is danger or risk of collision whenever it is not clearly safe to go on.'" *Ocean Marine Ltd.*, 300 F.2d at 499 (citations omitted).

■ 7. "Once vessels enter into ... a potentially dangerous relationship, their obligations are fixed" and are not altered by subsequent maneuvers. *Id.; United States v. S.S. Malden*, 224 F.Supp. 705, 710 (E.D.Va.1963).

■ 8. At a range of approximately 4.5 miles, when SAUDI RIYADH observed RADFORD crossing the SAUDI RIYADH's bow from starboard to port, it was not clearly safe for SAUDI RIYADH to go on, and a risk of collision arose. Therefore, the obligations of the vessels under the COLREGS became fixed at that time and were not altered by subsequent maneuvers of the vessels. *See id.*

9. At the time the risk of collision arose and the parties' obligations became fixed, the vessels were engaged in a crossing situation within the meaning of Rule 15 of the COLREGS. Rule 15 of the COLREGS provides that a vessel, maintaining its course and speed, that holds another on its port bow, crossing the other's bow such that a risk of collision is involved, establishes itself as the stand-on vessel in a crossing situation.

■ 10. The stand-on vessel maintains its course and speed within the meaning of Rule 15 of the COLREGS, not only when its heading and speed are steady, but also when it continues to engage in a steady, predictable maneuver. *See United States v. S.S. Soya Atlantic*, 330 F.2d 732, 737 (4th Cir.1964); *Commonwealth & Dominion Line v. United States*, 20 F.2d 729, 731 (2d Cir.1927).

■ 11. The RADFORD, maintaining a steady speed and a steady turn for nearly six hours prior to the collision, was engaged in a steady and predictable maneuver. Therefore, when the SAUDI RIYADH approached the RADFORD from its port bow at a distance of 4.5 miles, and a risk of collision arose, the RADFORD became the stand-on vessel in a crossing situation, with the SAUDI RIYADH as the give-way vessel.

### The SAUDI RIYADH's Negligence

■ 12. As the give-way vessel in a crossing situation, the SAUDI RIYADH was obligated by Rule 16 of the COLREGS, to take "early and substantial action" to keep well clear of the RADFORD.

13. Rule 8 of the COLREGS defines the specific action that must be taken in order to avoid collision. Rule 8 provides that a vessel may alter course and/or alter speed, but requires that the alteration be both positive and made in ample time. Rule 8(b) specifically states that any alteration of course or speed must be large enough to be readily apparent to another vessel observing visually or by radar and should not be made in a succession of small alterations. Rule 8(d) requires that action taken to avoid collision shall be such as to result in passing at a safe distance and that the effectiveness of the action be checked until the other vessel is finally past and clear. If necessary to allow more time to assess the situation, Rule 8(e) requires that a vessel slacken her speed.

■ 14. The SAUDI RIYADH did not reduce its speed prior to the collision, and her only alterations of course were two slight alterations from 231 degrees to 237 degrees and from 237 degrees to 240 degrees, between 2329 and 2330. Although the SAUDI RIYADH was in no way restricted in her maneuvering, she made just two slight alterations of course in succession for a total of 9 degrees. This 9 degree alteration was not broad enough to avoid the risk of collision or result in a safe passing distance. As this was the only alteration that the SAUDI RIYADH effected until twenty to thirty seconds prior to the collision, when collision was al-

ready inevitable, the court concludes, as a matter of law, that the SAUDI RIYADH negligently failed to comply with its obligations under Rules 8 and 16 of the COLREGS. *See United States v. M/V Wuerttemberg,* 330 F.2d 498, 504 (4th Cir.1964) ("When safe means of avoidance of risk of collision are obviously and readily at hand, their neglect is inexcusable."). SAUDI RIYADH's failure to comply with its obligations under Rules 8 and 16 was a substantial and proximate cause of the collision.

15. This negligent failure to take appropriate avoiding action was a direct result of Third Mate Manuel Tolosa's failure to utilize all navigational equipment available to him, including the ARPA radar, and his unfounded assumptions regarding the RADFORD's course. These deficiencies in Tolosa's navigation of the SAUDI RIYADH were also direct violations of the COLREGS, as set forth below, and, to the extent that they prevented Tolosa from taking early and substantial action to avoid the collision, these deficiencies contributed significantly to the collision.

16. Rule 7 of the COLREGS provides that every vessel shall make proper use of all available means appropriate to the prevailing circumstances and conditions to determine if a risk of collision exists. Compliance with the rule requires that a vessel equipped with radar properly use it. Third Mate Tolosa failed to use either the history dots or the PAD function on the Sperry ARPA radar and, consequently, failed to understand the RADFORD's maneuver or to appreciate that a risk of collision existed. Tolosa also failed to make proper use of the SAUDI RIYADH's VHF radio to contact the RADFORD and determine the RADFORD's intentions and course. Although Tolosa placed three calls on the VHF radio, two of these calls were placed on the incorrect channel, and all three of the calls failed to identify the RADFORD by geographic location, as is customary and proper. The failure to properly utilize all means available to determine if a risk of collision existed was clearly a violation of Rule 7 of the COLREGS, and, to the extent that it prevented Tolosa from appreciating that the RADFORD was maneuvering in a constant, steady circle around the special purpose buoy and that a 9 degree course change would not remove the SAUDI RIYADH from the area of danger, it substantially contributed to the collision.

17. Furthermore, Rule 7(c) of the COLREGS clearly cautions against assuming that it is safe to proceed in circumstances where the navigator, for any reason, including incomplete radar information, has doubt about the intentions of another vessel. In fact, Rule 7(a) requires that, if there is any doubt, risk of collision should be deemed to exist. Tolosa was in doubt regarding the RADFORD's course and intentions, yet he proceeded at full speed directly toward her. It is clear that had Tolosa resolved his doubts in accordance with the prudent assumption that a risk of collision existed as required by the COLREGS, and then taken the appropriate action, the collision would have been avoided, notwithstanding Tolosa's failure to properly utilize all available navigational aids. Accordingly, the court finds that his failure to do so further contributed to the SAUDI RIYADH's breach of its statutory duty to take timely avoiding action, in accordance with Rules 8 and 16 of the COLREGS.

18. Finally, Rule 34 of the COLREGS requires that "[w]hen vessels in sight of one another are approaching each other and from any cause either vessel fails to understand the intentions or ac-

tions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle." Mideast's navigational guidelines, in accordance with International Convention on Standards of Training, Certification, and Watchkeeping for Seafarers ("STCW"), Regulation 8, also require that an officer in doubt as to the safety of the ship, inform the master. Although Tolosa was clearly in doubt as to the RADFORD's intentions, as evidenced by his repeated attempts to contact the RADFORD via radio, Tolosa did not call the SAUDI RIYADH's master and did not sound any danger signals until approximately twenty to thirty seconds prior to the collision. Had the master been called, the collision may have been avoided. Moreover, had danger signals been timely sounded, the RADFORD was capable of reaching a complete stop within one ship's length and almost certainly could have avoided the collision. Accordingly, the court concludes that Third Mate Tolosa's negligent failure to take appropriate action to communicate his doubts by sounding his whistle and/or calling the master further contributed to the collision.[5]

*The RADFORD's Negligence*

■ 19. Although Rule 17 of the COLREGS, which governs the action of the stand-on vessel in a crossing situation, generally requires the stand-on vessel to maintain her course and speed, Rule 17(a)(ii) permits the stand-on vessel to take action to avoid the collision when it becomes apparent that the give-way vessel is not taking the appropriate action. In fact, Rule 17(b) requires the stand-on vessel to take such action when both vessels

enter extremis, such that action by both vessels is necessary if the collision is to be avoided. The RADFORD did not timely comply with either the permissive Rule 17(a) or the compulsory Rule 17(b). Had the RADFORD maneuvered as required, the collision could have been avoided, notwithstanding the SAUDI RIYADH's failure to give-way as required. Accordingly, the negligent failure of the RADFORD to timely maneuver to avoid the SAUDI RIYADH was also a substantial and proximate cause of the collision.

■ 20. The failure of the RADFORD to timely maneuver in accordance with Rule 17 was, as stipulated, directly precipitated by the RADFORD's failure to maintain a proper lookout as required by Rule 5 of the COLREGS. The RADFORD crew members below deck in CIC failed to appreciate or communicate the risk posed by the SAUDI RIYADH's approach. The status board keeper on the bridge failed to effectively communicate the reports he received regarding the SAUDI RIYADH's approach to the OOD. Finally, the watchstanders on the bridge, preoccupied with the calibration exercise, failed to check the status board or to visually observe the SAUDI RIYADH until seconds before the collision. This significant violation of Rule 5 of the COLREGS was clearly negligent, and, to the extent that it prevented the RADFORD from taking action necessary to avoid the collision as required by Rule 17(b) of the COLREGS, the failure to maintain a proper lookout also substantially contributed the collision.

*Allocation of Fault*

21. In summation, the negligence of both the SAUDI RIYADH and the RAD-

---

**5.** Although the RADFORD also failed to sound danger signals, this did not contribute

to the accident, as the SAUDI RIYADH was fully aware of RADFORD's proximity.

FORD contributed to this collision. Third Mate Manuel Tolosa failed to properly utilize all of the navigational aids available to him onboard the SAUDI RIYADH. Consequently, Tolosa, though constantly observing the RADFORD, failed to appreciate the RADFORD's steady, circular maneuver. Although clearly in doubt as to the RADFORD's intentions, Tolosa proceeded directly into the RADFORD's predictable circular course, without reducing his speed, calling the master of the ship, or sounding any danger whistles to communicate his doubts and alert the RADFORD to his ship's presence. The SAUDI RIYADH took no significant action, whatsoever, to avoid the collision until seconds prior to the collision. Furthermore, as stipulated, the RADFORD clearly failed to maintain a proper lookout and, consequently, failed to comply with its obligation under Rule 17 to take action to avoid the collision once it became apparent that the SAUDI RIYADH was not complying with its obligations as the give-way vessel.

22. Although both vessels are clearly at fault, the court finds that the majority of fault lies with the SAUDI RIYADH, as the give-way vessel and the vessel that was fully aware of the circumstances giving rise to the danger. *See, e.g., Fathom Expeditions v. M/T Gavrion,* 402 F.Supp. 390, 393–94 (M.D.Fla.1975) (holding the burdened vessel in a crossing collision 60% liable for failure to keep out of the way, and the privileged vessel 40% liable *for having no lookout* ); *In re Kaisha,* 629 F.Supp. 1374, 1382 (S.D.N.Y.1986) (same); *The Catskill,* 38 F. 367, 368 (S.D.N.Y.1889) (holding that the vessel

which sees the danger must act on it and will be held liable for failure to take timely avoiding action). Accordingly, under the facts of this case, the court finds that the collision was 65% the fault of the SAUDI RIYADH's negligence and 35% the fault of the RADFORD's negligence.

23. As the court allocates 65% of the fault to the negligence of the vessel owned by the limitation plaintiffs, the court must now proceed to determine whether the limitation plaintiffs are entitled to limit their liability for that negligence. *See Empresa Lineas Maritimas Argentinas S.A.,* 730 F.2d at 155.

## III. *Limitation*

### A. *Findings of Fact*

*The Limitation Plaintiffs' Safety Management System and the Selection, Evaluation, and Training of Deck Officers*

1. NSCSA, owner of the SAUDI RIYADH, is a corporation existing under the laws of the Kingdom of Saudi Arabia. Mideast, a foreign corporation located in Dubai, United Arab Emirates, is the operator of the SAUDI RIYADH, and is responsible for the maintenance and operation of the vessel, including the crewing. Mideast operates twenty-three vessels, seventeen of which are owned by NSCSA.

2. NSCSA owns an 80% interest in Mideast, with the Acomarit Group ("Acomarit") owning the remaining 20% interest.[6] Acomarit, although maintaining an investment interest in Mideast, has no management control over Mideast, and Mideast has no management control over Acomarit. Likewise, NSCSA and Acomar-

---

**6.** While the parties refer to Mideast as a "joint venture" between NSCSA and Acomarit, it is not such under the law. *See generally* 46 AM. JUR. 2D *Joint Ventures* § 1 (1994) (defining joint venture). NSCSA and Acomarit are shareholders/owners of the corporate entity Mideast, whereas a joint venture is a relationship legally treated as a partnership under principles of partnership law. *See, e.g., Pine Products Corp. v. United States,* 945 F.2d 1555, 1560 (Fed.Cir.1991).

it have no management relationship between them; they share only the joint ownership interest in Mideast. The companies function as separate and distinct entities.

3. Acomarit is a ship management company with offices and affiliates worldwide and its principal office in Glasgow, Scotland. Acomarit manages about 230 ships. While the majority of Acomarit's business is managing vessels, it also provides crew to vessels owned by others. Acomarit has nine crewing offices and is responsible for about 5,900 crewmembers onboard ships.

4. Mideast entered into an agreement with Acomarit to provide officers and crewmembers to serve on vessels owned by NSCSA and managed by Mideast. Because NSCSA requires Philippine junior officers, Mideast utilizes Acomarit's crew supply office in Manila to recommend junior deck officers.

5. This office of Acomarit is the fifth largest crewing office in Manila and is ranked highly among the approximately 350 crewing offices in Manila. The office is audited annually for compliance with the rules of crew manning offices by Det Norske Veritas, a classification society, and is in compliance with the applicable standards.

6. Mideast licenses from Acomarit a safety management system to ensure the safe operation of the vessels. The system is contained in a set of manuals which are specific to office operation and another set of manuals, which are maintained aboard ship, specific to vessel operations. The former include an office quality assurance manual for the crewing department, which sets forth the qualifications required of, and the procedure for evaluating, deck officers. Mideast's safety management system has been audited by both Det Norske Veritas and Lloyd's Register of Shipping, classification societies, and has been found to be in compliance with applicable safety standards.

7. Pursuant to the crewing agreement between the parties, and in accordance with the safety management system, Mideast and Acomarit participate in an integrated system for the selection of qualified deck officers.

8. When Mideast requests a deck officer, and no seastaff previously employed by Acomarit or Mideast is available, Acomarit accepts outside applicants referred to as "new recruits." In order to evaluate a new recruit, Acomarit first requests and authenticates the candidates' licenses and certificates.

9. In addition to the required licenses, general experience, and qualifications, Mideast requires that a third mate have at least one year of service in his rank.

10. Acomarit conducts a short, initial interview to determine, based upon available information, whether the person is a suitable candidate. Acomarit then contacts the recruit's prior employer, and the candidate is required to undergo a medical examination.

11. New recruits are also directed to take a Seafarer's Evaluation and Training System ("SETS") test. The test is provided by Philippine Transmarine Carriers, another large Filipino crewing agent. The SETS test is not required by statute or regulation, and only approximately 30 of 350 crewing agents in Manila use the SETS test in their hiring process.

12. The SETS test is a multiple choice test, generated by computer, which lasts approximately ninety minutes. The computer selects questions randomly from a pool of 2,000 questions based upon information provided by the test-taker regarding the shipboard job he seeks. Because of the random computer selection process,

it is not possible to determine precisely what questions an applicant was asked on the SETS test.

13. If a candidate's overall score on the SETS test is below 50%, Acomarit will not further consider an applicant. However, there is no established pass or fail grade for any section of the test. On any test subject, if the applicant scores less than 50%, the computer prints the notation "training needed."

14. Acomarit then uses the SETS test as a guide for conducting a final, comprehensive interview, called the "technical interview." Thus, the notation "training needed" is not a specific instruction as to whether additional training should be given. The technical interviewer makes an independent assessment of whether further training is needed after questioning the candidate and thoroughly evaluating his credentials.

15. The technical interview is conducted by a qualified marine personnel officer who, in the case of deck officers, has a master's license and command experience. The technical interview is Acomarit's principal means of assessing whether an applicant is technically competent to perform in the position for which he has applied and whether he has the necessary personal qualities.

16. If an applicant proceeds successfully through the technical interview, he is then proposed to Mideast for employment. Mideast receives a listing of the applicant's licenses, qualifications, and experience, together with the technical interviewer's recommendation for hiring, and makes the final decision regarding which candidates to hire. Of considerable import in this case, Mideast does not receive a copy of the SETS test results.

17. Once a deck officer arrives onboard a Mideast managed ship, there is familiari-zation training in safety and any equipment the officer will be using in the course of his duties onboard the vessel. He is familiarized with bridge equipment, including radar, by the officer he relieves.

*Selection of Manuel Tolosa As Third Mate of the SAUDI RIYADH*

18. Tolosa graduated from the Iliolo Maritime Academy in the Philippines in March, 1985. He went to sea in 1987 in various unlicensed capacities. In 1994, Tolosa obtained a license as a third mate from the Professional Regulatory Commission in the Philippines.

19. Tolosa first sailed as a third mate in June, 1995, aboard a general cargo vessel for six months. He then served aboard a bulk carrier for ten months from mid–1996 until the spring of 1997. Thereafter, he served aboard the Alcoa vessel M/V PROSPECTOR II, an oil bulk ore carrier, from August, 1997, through March, 1998. For two months of that time, PROSPECTOR II was in drydock. Tolosa joined the SAUDI RIYADH on May 10, 1998, as a third mate.

20. Captain Ladera was the marine personnel officer who recruited and evaluated Third Mate Tolosa on behalf of Acomarit before Tolosa was hired to serve as the third mate of the SAUDI RIYADH. Prior to becoming a marine personnel officer, Ladera sailed aboard ships for sixteen years. He has held all marine deck licenses, including a master's license. Ladera has also taught marine subjects, including basic safety, tanker courses, and the use of ARPA radar. In conjunction with the ARPA course, Ladera instructed students in the COLREGS. Ladera is responsible for recommending crewmembers to twenty-one ships, including vessels that are owned or managed by companies other than Mideast. Ladera is not an officer or director of Acomarit.

21. Ladera met Tolosa in March, 1998. Tolosa had not previously been employed by Acomarit or Mideast and, therefore, was considered a "new recruit."

22. On April 15, 1998, Ladera conducted his initial interview of Tolosa. The initial interview lasted approximately thirty minutes. Ladera determined that Tolosa held all the required licenses to serve as the third mate on the SAUDI RIYADH. After the initial interview, Tolosa was sent to get a physical.

23. Ladera then contacted Tolosa's previous employer, Alcoa. Tolosa was listed to join one of Alcoa's vessels, and Alcoa reported that it had been satisfied with Tolosa's prior performance.

24. Prior to the technical interview, Tolosa was also sent to take the SETS test. However, because Tolosa had taken the SETS test within one year, on June 7, 1997, the previous scores were still considered valid, and the administrator, in accordance with standard procedure, refused to readminister the test.

25. Captain Ladera conducted Tolosa's technical interview on April 20, 1998. The interview began at 9:00 a.m. and concluded at 10:50 a.m. Prior to conducting the technical interview, Ladera reviewed Tolosa's previous SETS test results. Although Tolosa scored above 50% overall, the notation "training needed" appeared next to four subjects, including the COLREGS and the use of radar. Ladera used these notations to guide the questions he asked Tolosa in the technical interview, concentrating on these subjects.

26. Based upon his experience, Ladera found that it would not be unusual to see the notation "training needed" beside the radar SETS test results because the questions typically ask for technical informa-tion in numbers, such as wave lengths and distances, which have little relevance to actual navigation.

27. Ladera had a guidebook which contained questions for use in the technical interview. He also referred regularly to the COLREGS during the interview. In addition, Ladera maintained a picture of an ARPA radar in his office and had a maneuvering board, both of which he also frequently used during the technical interview process. The photograph was used to ask the candidate how to work the various switches on the face of the ARPA, and ARPA collision avoidance features were often tested by the use of the maneuvering board.

28. Although Ladera did not recall the specific questions he asked Tolosa in his technical interview, Ladera questioned Tolosa regarding the use of radar, including the ARPA radar, and the COLREGS to satisfy himself that Tolosa was proficient in these areas. Ladera also believed that he used the ARPA radar photograph, as was his practice. Ladera was satisfied with Tolosa's understanding of radar concepts and the COLREGS.

29. Ladera also learned from Tolosa that, between June 9, 1997, the date Tolosa took the SETS test, and the date of his technical interview, Tolosa had used an ARPA radar on PROSPECTOR II.[7]

30. After a thorough review of Tolosa's certificates, prior experience, the evaluation given by Tolosa's former employer, and the answers given in the technical interview, Ladera determined that Tolosa was qualified to serve as the third mate of the SAUDI RIYADH.

31. Satisfied with Tolosa's qualifications, Ladera sent the Mideast crew coor-

---

7. It was subsequently determined that the ARPA radar on PROSPECTOR II was a Sper-ry ARPA, like that onboard the SAUDI RIYADH.

dinator a facsimile transmission, listing Tolosa and other applicants as potential deck officers to be assigned to Mideast ships. Ladera sent the first and third pages of the application form for each candidate, in accordance with standard procedure. The SETS test results appeared on page four. Consequently, the earlier SETS tests results for Tolosa were not forwarded to Mideast, and Mideast did not know of the use of the SETS test until after the collision.

32. Mideast accepted Tolosa for employment as the third mate on the SAUDI RIYADH, based upon the forwarded portions of Tolosa's application and the recommendation of Captain Ladera.

33. As part of Mideast's policy, immediately upon joining the SAUDI RIYADH, Tolosa received familiarization training from the third mate that he was relieving, in which he was familiarized with a third mate's responsibilities and with the operation of all bridge navigational equipment, including the ARPA radar. Captain Moore, the master of the SAUDI RIYADH, also monitored Tolosa's performance and was satisfied with Tolosa's knowledge of the COLREGS and his ability to operate the radars onboard SAUDI RIYADH.

34. Neither Mideast nor NSCSA had any reason to believe, based upon the forgoing evaluation of Third Mate Manuel Tolosa, that Tolosa was incompetent to navigate the SAUDI RIYADH, or more specifically, that his skill in the use of the ARPA radar or the operation of the COLREGS was deficient.

B. *Conclusions of Law*

 1. Limitation of a shipowner's[8] liability for losses resulting from a collision is governed by 46 U.S.C.App. § 183(a). This statute allows the owner of a vessel to limit its liability for losses resulting from a collision to the value of its interest in the vessel and her freight, if the owner can show that the cause of the collision was not within its privity or knowledge. *See* 46 U.S.C.App. § 183(a). Stated differently, the statute permits a shipowner to limit its liability if the owner demonstrates that it could not, through the exercise of reasonable diligence, "have taken action while the vessel was in port and under its authority and control that would have prevented the negligent acts at sea." *Empresa Lineas Maritimas Argentinas S.A.,* 730 F.2d at 155 (citing *Spencer Kellogg Co. v. Hicks,* 285 U.S. 502, 511–12, 52 S.Ct. 450, 76 L.Ed. 903 (1932)). Thus, if the collision resulted from navigational errors that the shipowner had no reason to believe were likely to occur, the shipowner is entitled to limit its liability for the negligence of its crew. *See Hellenic Lines, Ltd. v. Prudential Lines, Inc.,* 813 F.2d 634, 638 (4th Cir.1987). If, however, the collision occurred because the shipowner neglected its "duty to man the ship with a competent crew," staffing the ship with crew members that the shipowner knew, or should have known, were incompetent or inadequately trained, the shipowner must be held responsible for the full extent of the loss caused by its crew. *Id.*

 2. In order to demonstrate an entitlement to limit liability under the statute, a shipowner need only demonstrate that "it took appropriate steps to ensure, and reasonably believed that 'the ship was well found, properly manned, and staunch, tight, and adequately equipped.'" *Carr v. PMS Fishing Corp.,* 191 F.3d 1, 6 (1st

---

**8.** The term "shipowner," as used in the statute, has been construed to include a ship management company responsible for the operation of the vessel. *See In re Chesapeake Shipping, Inc.,* 803 F.Supp. 872, 874–75 (S.D.N.Y.1992).

Cir.1999) (citing *The S.S. Hewitt,* 284 F. 911, 912 (S.D.N.Y.1922)). A shipowner will not be charged with the negligence of third persons employed by the shipowner to put the vessel in seaworthy condition where the owner has, "in good faith, exercised due diligence and care in the selection of such persons" to ensure that they are "trustworthy, experienced, and capable of performing the service, and of good reputation in the business." *Pocomoke Guano Co. v. Eastern Transp. Co.,* 285 F. 7, 10 (4th Cir.1922); *see also Coryell v. Phipps,* 317 U.S. 406, 412, 63 S.Ct. 291, 87 L.Ed. 363 (1943).

▪ 3. The evidence in this case, as set forth in the findings of fact above in Section III.A., establishes that the limitation plaintiffs took appropriate steps to ensure, and reasonably believed that the SAUDI RIYADH was well-manned with a competent third mate. The limitation plaintiffs employed Acomarit's crewing office in Manila, one of the largest and most highly esteemed crewing agents in the Philippines to evaluate and recommend competent deck officers, in accordance with a well-established and proven effective safety management system. The safety management system utilized by Mideast and Acomarit sets forth a detailed procedure to ensure that candidates hold the necessary licenses, have the requisite experience, and possess the skills for serving aboard ship. The required documents and certificates are verified; there is a determination that the applicant's experience is adequate, including Mideast's requirement of one year in rank; and there is a technical interview in which the technical ability of the candidate is assessed by a qualified master mariner with command experience. Finally, after review and acceptance by Mideast, a deck officer is directed through an onboard familiarization process and is observed and evaluated by senior officers to monitor any further training requirements. These procedures are audited annually and consistently comply with industry safety standards.

▪ 4. Mideast acted reasonably in employing Acomarit, an experienced and reputable crewing agency to recommend a competent third mate for the SAUDI RIYADH, and in hiring Tolosa based upon that recommendation and the information they received regarding Tolosa's qualifications. In accordance with the Fourth Circuit's holding in *Pocomoke Guano Co.,* 285 F. at 10, this court concludes that, even assuming Acomarit was negligent in recommending Tolosa as a third mate for the SAUDI RIYADH, the limitation plaintiffs, having satisfied their duty of due diligence to ensure that an effective crewing system was in place, may not be charged with this negligence and are entitled to limit liability pursuant to 46 U.S.C.App. § 183(a).[9]

---

9. The evidence established that, although Acomarit holds a 20% investment interest in Mideast and NSCSA holds the other 80% interest, Acomarit exerts no management control over Mideast, or vice versa; and Acomarit and NSCSA have no management relationship between them. *See supra* at III.A.2 and note 6. Accordingly, the mere fact of Acomarit's investment interest in Mideast with NSCSA does not render the companies interchangeable, such that the actions of Acomarit may automatically be attributed to Mideast or NSCSA. *See generally Hemphill v. Orloff,* 277 U.S. 537, 549–50, 48 S.Ct. 577, 72 L.Ed. 978 (1928); *Smith v. Setzer & Sons, Inc. v. South Carolina Procurement Review Panel,* 20 F.3d 1311, 1317 (4th Cir.1997) (cases recognizing corporations are separate entities from shareholders). *Compare* 18A AM. JUR. 2D *Corporations* §§ 851 and 852 (1985) (shareholders generally not liable in absence of proof of active participation in management of corporation or the wrongdoing itself). In effect, Acomarit operated as an independent contractor employed by Mideast for crew screening and recommendations. *See generally* RESTATEMENT (SECOND) OF AGENCY § 2

■ 5. Moreover, the court finds that Acomarit did not, in fact, act negligently in recommending Tolosa as a third mate for the SAUDI RIYADH. Although Tolosa scored relatively low on the radar and COLREGS portions of the SETS test almost a year before his interview with Captain Ladera, the SETS test is used solely as a guide for the marine personnel officer in conducting the technical interview. The SETS test results are not dispositive of any need for further training, but rather provide the technical interviewer with an idea of the areas in which the interviewer should concentrate his questions. Indeed, Captain Ladera used the relatively low scores that Tolosa received in radar and the COLREGS in this manner. He questioned Tolosa in these areas and was satisfied with Tolosa's knowledge. Moreover, Ladera's independent assessment of Tolosa's competency was reinforced by Tolosa's intervening experience. It was reasonable for Captain Ladera to conclude that, even if at the time the SETS test was administered in June, 1997, Tolosa was in some way deficient in his knowledge of radar and the COLREGS, his experience onboard the PROSPECTOR II had increased Tolosa's proficiency.

6. Captain Ladera was well-qualified to assess the qualifications of Tolosa and conducted a proper evaluation of his credentials and competency prior to recommending him to Mideast to serve as the third mate of the SAUDI RIYADH. Based upon Tolosa's certificates, prior experience, the evaluation of Tolosa's former employer, and the results of the comprehensive technical interview, Captain Ladera reasonably concluded that Tolosa was competent for the position. In light of the extensive evaluation that Ladera conducted, the court finds that the SETS test results alone, even if made available to Mideast, would not have rendered Mideast's decision to accept Ladera's recommendation on behalf of Acomarit unreasonable or given Mideast any reason to believe that Tolosa was anything less than competent to navigate the SAUDI RIYADH.

7. Thus, the court concludes that the limitation plaintiffs exercised due care in the selection of Tolosa and did not have reason to believe that Tolosa would commit the navigational errors that gave rise to the collision with the RADFORD. Accordingly, the limitation plaintiffs are entitled to limit their liability for the negligence of the SAUDI RIYADH to the value of the vessel and her freight, pursuant to 46 U.S.C.App. § 183(a). *See, e.g., Empresa Lineas Maritimas Argentinas S.A.,* 730 F.2d at 155; *Hellenic Lines, Ltd.,* 813 F.2d at 638.

As previously directed by the court, the parties shall submit proposed findings of fact and conclusions of law on the remaining issue of damages on or before June 30, 2000. The court **DIRECTS** the Clerk to send a copy of this Opinion to all counsel of record.

(1958) (defining independent contractor); RESTATEMENT (SECOND) OF TORTS § 409 (1965) (employer of an independent contractor not liable for harm caused by act or omission of contractor or its servants).