In the matter of the complaint of HELLENIC LINES, LTD., as owner of the M/V HELLENIC CARRIER for Exoneration from or Limitation of Liability, Appellee,

v.

PRUDENTIAL LINES, INC., Appellant,

and

General Poultry Corporation, et al., Defendants (Three Cases).

Nos. 86–3803 to 86–3805.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 9, 1986.

Decided March 5, 1987.

Rehearing Denied March 31, 1987.

---

William L. Peck (Glen A. Huff, Robert M. Hughes, III, Seawell, Dalton, Hughes & Timms, Norfolk, Va., on brief), for appellant.

R. Arthur Jett, Carter B.S. Furr (Jett, Berkley, Furr & Price, Norfolk, Va., on brief), for appellee.

Before HALL, CHAPMAN and WILKINS, Circuit Judges.

CHAPMAN, Circuit Judge:

On March 22, 1984 we remanded this case to the district court for reconsideration of the apportionment of fault between the parties, and for reconsideration of the district court's limitation of Hellenic's liability under our holding that Hellenic was in violation of Rule 19(d)(i) of the 72 COLREGS and that Hellenic's use of "parallel indexing" did not comply with Rule 7(b) of the 72 COLREGS. *See Hellenic Lines Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159 (4th Cir.1984). The district court has now reapportioned the liability at fifty percent each and it has again allowed Hellenic to limit its liability to the value of its vessel and her freight. Both parties have appealed. Prudential appeals the limitation of Hellenic's liability, and Hellenic appeals the reapportionment of fault. We affirm the limitation of liability and based upon the findings of fact in the record we reapportion the fault with sixty five percent charged to Prudential and thirty five percent to Hellenic.

I.

The basic facts surrounding this collision are set forth in our prior opinion and it is not necessary to restate them here. Upon remand the district court readopted certain of its findings of fact and made some additional findings applicable to the issues framed on remand. At the time of the collision the watch officer on the bridge of the Hellenic was second mate Konstantinos T. Rentas. This officer was not capable of radar plotting, a sophisticated charting method by which the location, speed and direction of neighboring ships is determined by their movements on the radar screen. Rentas attempted to determine the location and speed of the Lash Atlantico by using a less exact method of radar interpretation known as "parallel indexing." We held in the prior opinion that "parallel indexing" is not an "equivalent systematic observation" to radar plotting as required by Rule 7(b) of the International Regulations for Preventing Collisions at Sea, 1972 (72 COLREGS). Prudential argues that Rentas was incompetent to be standing watch at the time of the collision because he could not radar plot, and that the owner of the Hellenic Carrier had knowledge or was "in privity" with this incompetence of Rentas, thus precluding limitation of liability.

Rentas held a second mate's license, the issuance of which does not require a showing of an ability to "radar plot" the movement of ships. Under Greek law, a licensed second mate is authorized to stand watch at any hour. Although Hellenic had been unable to locate a chief mate for this voyage, when the Greece Bureau for Finding Work for Unemployed Seamen issues a letter to the harbor master of a Greek port advising such harbor master that it has been unable to locate an unemployed licensed chief mate, the harbor master is authorized to allow a Greek vessel to sail

with a licensed second mate acting in the capacity of the vessel's chief mate. This is a type of waiver of the preferred complement of a ship's officers and it is effective for a limited period of time. The district court found that at the time of the collision the Hellenic Carrier was operating under such a waiver and that all of its officers and crew were properly licensed or documented in accordance with Greek law.

The captain of the Hellenic Carrier was fully qualified in radar plotting and he had instructed his watch officers to call him when weather permitted only limited visibility. Rentas failed to summon the captain to the bridge prior to the collision, although the ship had just entered a fog and was operating in limited visibility.

Hellenic had several general policies pertaining to the operation of its ships. It furnished the master of the Hellenic Carrier with various directives, circulars, literature, guidelines and regulations for training his crew, standing watch, posting lookouts, complying with general navigational techniques, and operating in restricted visibility. The policy of Hellenic was to have an independent captain conduct a periodic page by page review of the ship's log and certificates.

The district court, based on a preponderance of the evidence, found that, at the commencement of this ill-fated voyage, Hellenic had exercised due diligence to ensure that the Hellenic Carrier was a seaworthy vessel. The court concluded:

> In relation to this voyage, the vessel was properly licensed and properly manned. This court has found that at the time of collision, there was fog and still so finds. It further finds that the fog was trailing the Lash Atlantico and that the Hellenic Carrier was moving into it. It further found that the mate, Rentas, should have called the captain but he did not. He should have turned to starboard and slowed but did not. These are all mistakes of navigation and are not imputed to the owners.

Thus the district court granted Hellenic limitation of liability.

In reapportioning fault the court analyzed "speed, failure to stop, lack of plot-

ting, left turns, crew causation, close-quarters, lack of assistance, and all of the findings of fact by the appellate court." The district court concluded that the vessels were equally at fault. The court had previously found that radar plotting by Rentas would not have detected the small course changes performed by the Lash Atlantico.

## II.

Cross-appellants have raised two issues for our consideration. Hellenic argues that the district court improperly considered the Hellenic Carrier's violation of Rule 7(b) (failure to plot) in apportioning the degree of fault between the ships, because the district court specifically found that compliance with the requirements of Rule 7(b) would not have enabled the detection by the Hellenic Carrier of the small course changes of the Lash Atlantico just prior to the collision. Prudential argues that Hellenic should not be entitled to limit its liability to the value of the ship and her freight where it failed in its duty to man its ship with a competent crew.

### A. *The Apportionment Issue*

In its initial hearing of this case, the district court held that eighty percent of the fault in causing the collision was attributable to Prudential, the owner of the Lash Atlantico, and that the remaining twenty percent was attributable to Hellenic. Prudential appealed to this court, which remanded the case to the trial court for reconsideration of the apportionment of fault. *Hellenic Lines, Limited v. Prudential Lines, Inc.*, 730 F.2d 159 (4th Cir.1984). This court instructed the district court to reconsider its apportionment of fault in light of this court's determination that the Hellenic Carrier was in violation of Rules 7(b) and 19(d)(i). On remand, the district court reapportioned liability between Hellenic and Prudential at fifty percent each. The district court in making its reapportionment considered Hellenic's violation of Rule 7(b). This was error. The district court had already found that, even if the Hellenic Carrier had been in compliance with the Rule, the small course alterations of the Lash Atlantico were not discernible by plotting. Thus, the Hellenic Carrier's

failure to plot could not have been a contributing cause to the collision. The standard established in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873) is thus satisfied. *See Federal Insurance Company v. The S.S. Royalton*, 194 F.Supp. 543, 547 (E.D.Mich.1961), *rev'd on other grounds*, 312 F.2d 671 (6th Cir.1963). The inclusion in a comparative fault determination of an element of negligence found not to constitute a contributing cause to the accident is a mistake of law.

█ Rather than remand this case again for readjustment of the degree of fault, this court may apportion liability, provided no further fact finding is necessary for the reapportionment. 2 *Federal Procedure, L.Ed.* § 3:691 (1981). This authority of the appellate court has been bestowed by Congress, 28 U.S.C. § 2106, and is well-established in decisional law, *Insurance Co. v. Piaggio*, 83 U.S. (16 Wall.) 378, 21 L.Ed. 358 (1872); *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.* 516 F.2d 172 (2nd Cir.1975) (en banc), *rev'd on other grounds*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124, *reh'g denied*, 430 U.S. 976, 97 S.Ct. 1668, 52 L.Ed.2d 371 (1976); *Felder v. United States*, 543 F.2d 657 (9th Cir.1976). Moreover, appellate courts are to employ the same standards of review in admiralty cases as in all other appeals. *McAllister v. United States*, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); *United States v. S.S. Soya Atlantic*, 330 F.2d 732 (4th Cir.1964) (recognizing that appellate courts no longer have power to conduct *de novo* review in admiralty cases, and that admiralty cases would be reviewed under the same standard as nonadmiralty appeals). *See e.g., Ross v. Steamship Zeeland*, 240 F.2d 820, 823 (4th Cir.1957) (modifying damage award in admiralty case involving personal injuries).

█ The record before us is complete and no further facts could be brought to light which could possibly aid the court in determining liability. Thus, based on the record, which shows that the primary cause of the collision was the inoperability of the Lash Atlantico's radars, this court reapportions liability at sixty-five percent against Prudential and thirty-five percent against Hellenic.

## B. *The Limitation of Liability Issue*

█ Limitation of a shipowner's liability for losses resulting from a collision is governed by 46 U.S.C. § 183(a) (1976). This statute allows the owner of a vessel to limit his liability for losses resulting from a collision to the value of his interest in the vessel and her freight if the owner can show that the cause of the collision was not within his privity or knowledge. Privity and knowledge, as used in this statute, have been construed to indicate that a shipowner knew or should have known that a certain condition existed. "The shipowner is chargeable with knowledge of acts or events or conditions of unseaworthiness that could have been discovered through reasonable diligence." *Empresa Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir.1984). A shipowner seeking limitation of liability bears the burden of proving that he was without knowledge of the condition or negligence responsible for the collision. *Coryell v. Phipps*, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943).

█ The district court has found, as a matter of fact, that the owners of the Hellenic Carrier were not in privity with the negligence which contributed to the collision. The owner of a ship has a nondelegable duty to man the ship with a competent crew. *Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204, 210 (2nd Cir.), *cert. denied*, 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968). Where the acts of negligence result not from any lack of competence on the part of the crew, but rather are merely "mistakes of navigation," the shipowner is not precluded from the limitation of liability. Thus the issue, in deciding whether the district court was correct in its finding that Hellenic is entitled to limitation of liability, is whether Hellenic discharged the duty of diligence announced in *Empresa* so as to ensure, by the employment of a competent crew, the seaworthiness of its vessel. Only if this duty of diligence is discharged can the shipowner claim entitlement to limitation.

█ We find the holding of the district court satisfies the "clearly erroneous"

standard of Fed.R.Civ.P. 52. Although Rentas' inability to plot was a fact impliedly known by the shipowner due to Rentas' status as a second mate, such inability did not contribute to the collision. Only conditions of unseaworthiness that contribute to the collision are relevant to determining whether the shipowner is entitled to limitation. *Empresa, supra* at 155. Moreover, Hellenic had effectively overcome Rentas' inability by its instructions that, in a low visibility situation, the master of the ship was to be summoned to the bridge.

■ We agree with the district court that the remaining elements of alleged negligence, such as the failure to summon the captain to the bridge and the turn to port in a close-quarters situation, constitute errors of navigation. Although Prudential has brought to our attention several cases where navigational errors apparently gave rise to a finding that the shipowner had failed to man his ship with a competent crew, *see e.g., Empresa, supra; Complaint of Hercules Carriers, Inc.,* 566 F.Supp. 962 (M.D.Fla.1983), *affirmed sub nom. Hercules Carriers, Inc. v. Claimant State of Florida,* 768 F.2d 1558 (11th Cir.1985); *Matter of Ta Chi Navigation (Panama) Corp., S.A.,* 513 F.Supp. 148 (E.D.La.1981), *affirmed sub nom. Travelers Indemnity Co. v. United States,* 728 F.2d 699 (5th Cir.1984); *Matter of Texaco, Inc.,* 570 F.Supp. 1272 (E.D.La.1983); we find these cases inapposite. In each of these cases, a certain bit of information, if it had been known by the shipowner, would have led a reasonable shipowner to conclude that his ship was not seaworthy. For example, in *Empresa, supra,* the shipowner should have investigated the health complaints of the ship's master. That information, once revealed, would have led the owner to relieve the master of his duties, as the master had been suffering from a severe lack of sleep. Similarly, in *Hercules Carriers, supra,* the owner's knowledge that his ship was manned largely by unlicensed crew should have led him to believe that his vessel was unseaworthy.

In this case, however, no such additional bit of information is present which, if discovered, would have led Hellenic to believe its ship unseaworthy. Rentas was an experienced sailor. He held a second mate's license, which authorized him to stand watch at any hour. Moreover, the Hellenic Carrier was adequately manned under Greek law, and it had the approval of the Greek Coast Guard. There was no fact reasonably discoverable which would have led even a very cautious shipowner to conclude that the Hellenic Carrier was unseaworthy. Certainly the shipowner had a right to rely upon its express instructions that the master should always be called to the bridge during times of limited visibility. Rentas' failure to call the captain, along with his failure to comply with the proper steering procedures in a close-quarters situation, constitute mistakes of navigation to which the owner of the Hellenic Carrier is not deemed in "privity." We therefore

AFFIRM IN PART; REVERSE IN PART.