PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

IN THE MATTER OF THE
COMPLAINT OF VULCAN MATERIALS
COMPANY, owner of the Tug
William E. Polle, for exoneration
from or limitation of liability,

*Plaintiff-Appellant,*

v.

CASSITA MASSIAH, Executor of the
estate of Freddie N. Porter, Jr.,
deceased,

No. 10-1041

*Claimant-Appellee,*

v.

UNITED STATES OF AMERICA,

*Third Party Defendant-Appellee.*

AMERICAN WATERWAYS OPERATORS,

*Amicus Supporting Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry Coke Morgan, Jr., Senior District Judge.
(2:08-cv-00377-HCM)

Argued: March 23, 2011

Decided: May 6, 2011

Before WILKINSON, SHEDD, and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Wilkinson and Judge Shedd joined.

---

**COUNSEL**

**ARGUED:** John Early Holloway, TROUTMAN SANDERS, LLP, Norfolk, Virginia, for Appellant. Michael P. Abate, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Daniel O. Rose, KREINDLER & KREINDLER, New York, New York, for Appellees. **ON BRIEF:** Dawn Lee Serafine, TROUTMAN SANDERS, LLP, Norfolk, Virginia, for Appellant. Tony West, Assistant Attorney General, Thomas M. Bondy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Neil MacBride, United States Attorney, Alexandria, Virginia, for the United States. Megan Wolfe Benett, Steven R. Pounian, KREINDLER & KREINDLER, New York, New York; Michael F. Imprevento, BREIT DRESCHER & IMPREVENTO, PC, Norfolk, Virginia, for Appellee Cassita Massiah. Robert W. McFarland, R. Trent Taylor, MCGUIREWOODS LLP, Norfolk, Virginia, for Amicus Supporting Appellant.

---

**OPINION**

DUNCAN, Circuit Judge:

This appeal arises out of the death of Seaman Freddie N. Porter, Jr. ("Porter"), who was killed during a Navy training exercise when his rigid-hull inflatable boat ("RHIB") collided with the WILLIAM E. POOLE[1] tug as it was pushing an eight-barge flotilla up the James River. Claimant-Appellee

---

[1]Although the tug's name is the "WILLIAM E. POLLE," the district court's memorandum opinion and the parties' briefs refer to the tug as the "WILLIAM E. POOLE." For the sake of consistency, we do the same.

Cassita Massiah ("Massiah"), as personal representative for her son Porter's estate, brought a wrongful death suit against the tug owner, Plaintiff-Appellant Vulcan Materials Company ("Vulcan"). Vulcan, in turn, sought contribution from the United States as co-tortfeasor. The district court awarded $1,250,000 in damages to Porter's family members but refused, on sovereign immunity grounds, to allow Vulcan's third-party contribution claim to proceed. On appeal, Vulcan challenges both the district court's determination that it was negligent for failing to post a proper lookout on the night of the accident, and the court's dismissal of Vulcan's third-party claim for lack of subject matter jurisdiction. For the following reasons, we affirm.

I.

A.

We recount the relevant facts as found by the district court. Nineteen-year-old Porter, a land-based supply clerk, volunteered to attend a two-week coxswain course. On October 11, 2007, he and fellow Navy personnel departed from the United States Navy's Little Creek Amphibious Base ("Little Creek") in five RHIBs to complete the course's final training exercise, which provided the students with an opportunity to practice navigating small vessels at night. Before departing Little Creek that afternoon, each RHIB's crew verified the proper functioning of its boat's running lights. The RHIBs—with call-signs Tango-1, Tango-2, Tango-3, Sierra Bravo, and Sierra Charlie—then navigated up the James River to Jordan Point, where the crews disembarked, had dinner, and waited for nightfall.

After darkness fell, the RHIBs' crews "conducted another pre-operation inspection, and again verified that all lights on the boats—including an all-around white light mounted next to the radar dome on the aft mast, and a set of red and green running lights mounted forward in the RHIBs—were func-

tioning properly." J.A. 1095. Porter boarded his RHIB, Tango-2, and took the forward lookout position, while a fellow student in the course, Petty Officer Esteban Angeles, piloted the boat. Petty Officer Albert Bollinger acted as the boat's safety observer and qualified coxswain.

While the Navy RHIBs were making their way back down the James River that evening, Captain Rondy Wooldridge was maneuvering his tug, the WILLIAM E. POOLE, upriver toward Richmond. The tug had left Norfolk earlier that day pushing a flotilla of six barges. With thirty-three years of experience navigating the James, Captain Wooldridge had made similar trips "thousands of times," J.A. 1096, and was doing so this time as a Vulcan employee.

Approximately one hour before nightfall, Captain Wooldridge instructed his deckhand, Joseph Christensen ("Christensen"), to position and illuminate the flotilla's running lights. Christensen placed a green light on the starboard (right) side of the flotilla, a red light on the port (left) side of the flotilla, and a flashing amber light as close to the center as possible.

After passing under the James River Bridge, the POOLE stopped at Hog Island and picked up two additional barges. The final eight-barge flotilla configuration comprised a forward row of three barges, a middle row of three barges, and an aft row of two barges (in the center and starboard positions), with the POOLE positioned behind the aft center barge. Because each barge measured nearly 200 feet long, the flotilla extended about 585 feet in front of the POOLE. Since the barges were empty, their decks rose approximately twelve feet above the water line. This arrangement created a blind spot extending approximately 600 feet in front of the barges. From their perch in the POOLE's wheelhouse, Captain Wooldridge and Christensen could not see the river for some distance in front of the flotilla, much like a driver is unable to see the road immediately in front of his car.

Christensen rearranged the flotilla's running lights to account for the new configuration. With the lights in place, the POOLE departed Hog Island around 10:00 p.m. and continued up the river toward Jamestown Island. Captain Wooldridge was at the helm and Christensen was standing lookout with him in the wheelhouse. On that particular night, "there was little if any ambient light," and "the shores, the water, and the sky were dark." J.A. 1098. It was "windy and the water was choppy, with swells of one (1) to two (2) feet" that "caused clutter on the POOLE's radar, making it difficult to see objects with small radar returns—such as the RHIBs—on the radar screen." *Id.*

The James River forms an "S-curve" between Hog Island and Jamestown Island. Although the river is more than a mile wide throughout this area, the shipping channel is narrow—only 300 feet across. As the POOLE cleared the final turn in the S-curve and continued upriver toward navigational buoys 53 and 54, the Navy RHIBs were traveling downriver toward the same buoys.

The crew onboard Tango-2 noticed, but could not identify, a white light in the direction of the buoys. The light turned out to be the tug's spotlight, which Captain Wooldridge left illuminated on the port bow of the flotilla as he traveled upriver. Perceiving the light ahead, Tango-2's safety inspector, Bollinger, instructed the boat's driver, Angeles, to slow down and assess the situation before proceeding. Sierra Bravo's crew observed Tango-2 slow down and did the same. Both boats "drifted in the shipping channel with their bows pointed south while their crews tried to make out the source of the light." J.A. 1098. Petty Officer Julio Rodriguez Vargas, who was piloting Sierra Bravo, noticed a large object on his radar but could not identify it and did not inform Tango-2 of his observations. Although Tango-2 was also equipped with radar, no one aboard Tango-2 used it: "Angeles, who was in the operator's chair, did not know the RHIB was equipped with radar, and Bollinger, the boat's safety observer, did not know how

to use it." J.A. 1099. The other RHIBs farther downstream had seen the same light and consequently moved to the side of the shipping channel, eventually identifying the light as belonging to a tug. One of the instructors testified that there was radio chatter among the RHIBs about a tug in the river, but the Tango-2 crew did not recall hearing anything over the radio.

Before Tango-2 and Sierra Bravo could identify the source of the white light, the front of the POOLE's flotilla "emerged from the darkness on their port side." *Id.* Sierra Bravo avoided collision with the barge, but "Tango-2 was not so lucky." *Id.* Petty Officers Angeles and Bollinger leapt from the RHIB and ultimately swam their way to safety, but Seaman Porter did not survive the accident. His body later washed ashore, and an autopsy confirmed he sustained a fatal blow to the head from a tug propeller. The POOLE's crew testified that, while they had observed the other RHIBs pass the flotilla that night, they were completely unaware they had hit Tango-2 until the following day, when they were contacted by the Coast Guard.

Porter was survived by his mother (Massiah), father, and seven siblings. Shortly after Porter's death, the United States made a death gratuity payment to Massiah in the amount of one hundred thousand dollars ($100,000) and reimbursed her for Porter's funeral and burial expenses, in the amount of seven thousand twenty dollars ($7,020).

## B.

In August 2008, Vulcan, as owner of the POOLE, filed a complaint for exoneration from, or limitation of, liability for the collision pursuant to the Limitation of Liability Act, 46 U.S.C. § 30501-30512.[2] Massiah, as executor of her son Por-

---

[2]The Act allows a shipowner to limit his liability for any "injury by collision" occurring "without [his] privity or knowledge" to the "value of the

ter's estate, answered Vulcan's complaint and submitted an admiralty claim against it alleging negligence. Vulcan, in turn, filed a third-party complaint against the United States pursuant to the Public Vessels Act ("PVA"), 46 U.S.C. § 31101, and the Suits in Admiralty Act ("SAA"), 46 U.S.C. § 30901, alleging that the Navy was liable for the accident and seeking contribution for any damages owed to Porter's estate.

The United States answered the third-party complaint and filed a counterclaim against Vulcan demanding a judgment for "repairs to or replacement of" the Tango-2, the cost of providing medical care to the other crewmen in the Tango-2, and the cost of death benefits paid to Porter's estate. J.A. 71. The government then moved to dismiss Vulcan's contribution claim on the ground that it had not waived its sovereign immunity for contribution claims brought by a defendant held liable to a servicemember for injuries incurred incident to service, relying on the Supreme Court's decisions in *Feres v. United States*, 340 U.S. 135 (1950), and *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666 (1977). The district court reserved judgment on the sovereign immunity issue raised in the government's motion and proceeded to a bench trial on the question of negligence.

---

vessel and pending freight." 46 U.S.C. § 30505. Under the Act, and the corresponding Federal Rules of Civil Procedure for Admiralty and Maritime Claims ("Admiralty Rules"), a shipowner may seek to limit his liability by filing suit in a district court within six months of receiving notice of a claim related to a marine casualty. *Id.* at § 30511; Admiralty Rule F(1). After depositing with the court an amount of money, or approved security, equal to his interest in the vessel and the pending freight, "all claims and proceedings against the owner related to the matter in question shall cease." *Id.* at 30511(b), (c); Admiralty Rule F(1). The district court must then determine whether the shipowner is entitled to a limitation of liability. *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 813 F.2d 634, 638 (4th Cir. 1987) (explaining that a shipowner may limit his liability only by "proving that he was without knowledge of the condition or negligence responsible for the collision").

At the conclusion of trial, the district court found in an oral ruling and subsequent written decision that both the United States and Vulcan were negligent on the night of October 11, 2007, and that "Porter's death was proximately caused by the negligence of both the United States and Vulcan." J.A. 1101. The court found the United States negligent for having "operated an unseaworthy vessel by manning Tango-2 with an incompetent crew." *Id.* It based its negligence finding on the inexperience of the sailors, the fact that Tango-2 traveled downriver on the port side of the channel in violation of Inland Navigation Rule 9's ("Rule 9") requirement that vessels stay on the starboard side, the safety observer's decision to stop the boat in the middle of the shipping channel in further violation of Rule 9, and the fact that Tango-2 was equipped with radar equipment that its crew either did not know about or did not know how to use.

The district court determined Vulcan was at fault because it failed "to post a proper lookout," as required by Inland Navigation Rule 5 ("Rule 5"). *Id.* at 1102. The court reasoned that, given the conditions on the night in question and the "significant blind spot" created by the flotilla, Vulcan had an obligation under Rule 5 "to post a lookout on the bow of the leading barge, in addition to, not in lieu of, the deckhand who [was] with the captain" in the wheelhouse. J.A. 1084-85. In reaching its decision, the court relied on testimony from Vulcan's own credible expert witness, Captain Ray Robbins ("Captain Robbins"), who indicated that the decision to post a lookout is generally informed by the presence or absence of certain conditions. The district court found these conditions to be present on October 11, 2007: it was a "dark and windy" night with "choppy" water that caused clutter on the POOLE's radar; the POOLE "was in a narrow channel and, because of the eight barges it was pushing, had a significant blind spot"; and "small boat traffic is common on the James River." *Id.* at 1102. Moreover, the court made a finding that "the Captain's and his deckhand's visions were impaired," evidenced by the fact that "the Captain kept his searchlight

activated for an extended period of time in order to assist his vision while negotiating a difficult turning maneuver" and the fact that "neither the captain nor his deckhand saw Tango-2, although they had no difficulty seeing" the other four RHIBs. *Id.* at 1103. In sum, the court ruled that "[a]ll of the factors that inform whether to post a lookout pursuant to Rule 5" were satisfied, and Vulcan was negligent in failing to post one. *Id.*

Having found Vulcan negligent, the court next addressed whether it was entitled to limitation of liability. By statute, "the liability of the owner of a vessel for any claim, debt, or liability . . . shall not exceed the value of the vessel and pending freight" if the negligent act or condition occurred "without the privity or knowledge of the owner." 46 U.S.C. § 30505. Observing that a shipowner seeking limitation of liability bears the burden of proving a lack of privity or knowledge, the court found that Vulcan "should have known that a flotilla traveling on the James River, under the circumstances that prevailed on October 11, 2007, would need a lookout on the bow of the forward barge" and was responsible for "mak[ing] provisions for the availability of such lookout." J.A. 1105. The court held that Vulcan was therefore not entitled to limitation of liability.

The court apportioned 80 percent of the fault to the government and 20 percent to Vulcan, and awarded a total of $1,250,000 in damages to Porter's family members.[3]

---

[3]The court declined to enter judgment at the time of its oral findings, reserving decision on whether the government was protected from liability under either the *Feres-Stencel Aero* doctrine or the discretionary function exception. In its subsequent written decision, the court reiterated the bases for its negligence finding but did not discuss the government's argument that its selection of personnel for the training mission was protected by the discretionary function exception. Because we find that the *Feres-Stencel Aero* doctrine applies here, we need not reach the government's alternative discretionary function argument.

In its written decision, the court addressed Vulcan's claim against the United States for contribution. The government argued that Vulcan's claim was barred by the *Feres-Stencel Aero* doctrine, which insulates the United States from liability for third-party claims seeking indemnification or contribution for damages paid to a servicemember injured incident to service. *See Feres*, 340 U.S. at 135; *Stencel Aero*, 431 U.S. at 666. The district court agreed. In reaching this determination, the court focused on the presence of two of the three rationales underlying the *Feres-Stencel Aero* doctrine: (1) the existence of a statutory no-fault compensation scheme (the Veterans' Benefits Act) providing a death benefit to Seaman Porter, and (2) the adverse effect on military discipline that would result from a lawsuit challenging negligent orders or acts made or committed in the course of military duty. The district court also distinguished this Court's prior decision in *Ionian Glow Marine, Inc. v. United States*, 670 F.2d 462 (4th Cir. 1982), on the ground that, in that case, unlike the present one, the lawsuit did not pose a risk of harm to military discipline because the government stipulated to its degree of fault, thereby obviating the need to litigate its liability. The court further noted that the Supreme Court's opinion in *Lockheed Aircraft Corp. v. United States*, 460 U.S. 190 (1983), "undermines a key step in the logic of *Ionian Glow*, thereby casting doubt on the propriety of extending *Ionian Glow* beyond its facts." J.A. 1111.

For these reasons, the district court granted the United States' motion to dismiss Vulcan's contribution claim, and dismissed the United States as a party to this action. It then entered judgment against Vulcan for the full amount of damages. This appeal followed.

## II.

On appeal, Vulcan advances two main arguments. It first contends that the district court erred by finding Vulcan negligent for failing to post a lookout at the front of the flotilla on

the night of October 11, 2007. Vulcan next argues that, even if the district court did not err in its negligence finding, it nevertheless erred by holding that the *Feres-Stencel Aero* doctrine barred Vulcan's third-party contribution claim against the United States for tort damages paid by Vulcan to a servicemember killed in the course of military service. Vulcan specifically contends that this court's decision in *Ionian Glow* governs the outcome here and permits Vulcan to seek contribution from the United States for any tort damages owed to Porter's estate. We address each argument in turn.

### A.

We begin by considering Vulcan's challenge to the district court's finding that it negligently failed to post a proper lookout, as required by Rule 5. Vulcan's primary contention is that the district court erred as a matter of law by misapprehending and misapplying Rule 5's legal standard. It also claims the district court "made insufficient findings to support a causation finding" in this case, Appellant's Br. at 38, abused its discretion by failing to apply an adverse inference against the government for its alleged spoliation of evidence, and misapplied the rule regarding which party carried the burden of proof as to alleged violations of the Inland Navigation Rules. We treat a district court's findings of negligence as findings of fact reviewable under Fed. R. Civ. P. 52(a), *Bonds v. Mortensen & Lange*, 717 F.2d 123, 125 (4th Cir. 1983), and reverse only if the court's findings are clearly erroneous or based on a "misconception of the appropriate legal standard," *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378-79 (4th Cir. 1995).

### 1.

Vulcan's primary challenge to the district court's negligence holding is that the court misapplied the legal standard articulated under Rule 5. Rule 5 requires vessels to post "a proper look-out by sight and hearing as well as by all avail-

able means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 U.S.C. § 2005. Vulcan argues that the "court's fact findings spell-out clearly that the tug had a classically proper lookout under Rule 5," Appellant's Br. at 31, and that by concluding otherwise, the district court misunderstood the goal and application of Rule 5.

As evidence that the court misapplied the proper legal standard, Vulcan first cites the court's reliance on testimony provided by Vulcan's expert witness, Captain Robbins, urging that "the court badly misunderstood his clear testimony." *Id.* at 33. Captain Robbins testified that the decision as to what amounts to a proper lookout, as required by Rule 5, is informed by the following conditions: (1) "visibility," which decreases when it is a "dark night," J.A. 838-39, (2) the existence of a "blind spot" or a "dead zone," J.A. 842, (3) navigation through a "narrow channel," J.A. 842-43, and (4) the presence of "small boat traffic," J.A. 845. Captain Robbins further testified that, in his view, the conditions on the night of October 11, 2007, did not require the posting of an additional lookout. The district court, weighing the same factors as Captain Robbins, reached a different conclusion. It found that the presence of all the above-mentioned conditions in fact counseled in favor of requiring the posting of a lookout forward that evening. The court reached this conclusion based on its findings that

> the night was dark and windy; the water was choppy, which caused clutter on the POOLE's radar and made it difficult to see small boat traffic on the radar screen; the POOLE was in a narrow channel and, because of the eight barges it was pushing, had a significant blind spot; and Captain Wooldridge testified that small boat traffic is common on the James River.

J.A. 1102; *see also* J.A. 1083 (determining, as factfinder, that "all of the factors which even the defendant's expert agreed

should be considered" were present, "including a dark night, bad weather, . . . the narrow channel, . . . the blind spot, . . . and the presence of small traffic"). Record evidence supports these findings. Despite Vulcan's argument to the contrary, the district court's disagreement with Captain Robbins' assessment does not mean it misunderstood his testimony or misapprehended Rule 5's requirements. As factfinder, the court simply reached an alternative, reasonable conclusion based on the weight it afforded the evidence presented.

In its amicus brief, the American Waterways Operators ("AWO")[4] also challenges the district court's treatment of Captain Robbins' testimony, claiming that the court erred by relying on the factors articulated by Captain Robbins as opposed to those listed in the legislative history of Rule 5. That history states that when considering whether to post an additional lookout, "[f]ull account shall be taken of all relevant factors, including but not limited to the [1] state of the weather, [2] conditions of visibility, [3] traffic density, and [4] proximity of navigational hazards." S. Rep. No. 96-079 at 7-8, *reprinted in* 1980 U.S.C.C.A.N. 7068, 7075 (1980). AWO contends that "[a]ll vessels have blind spots so it is incongruous to find, as the district court seemingly did in this case, that a 'blind spot' is an 'obstruction' or restriction of visibility that Congress considers to be a circumstance requiring an additional lookout on the end of the flotilla." Amicus Br. at 6.

We find this argument unavailing for two reasons. First, the legislative history specifically indicates that the enumerated factors "include" but "are not limited to" those listed—in other words, the list is neither exhaustive nor exclusive. Moreover, with the exception of the court's reliance on Captain Robbins' testimony that the existence of a blind spot may

---

[4]AWO is "the national trade association for the inland and coastal tugboat, towboat, and barge industry." Amicus Br. at 1. AWO has 350 member companies and represents "the largest segment of the U.S.-flag domestic fleet." *Id.*

properly be considered as a factor, every other factor upon which the court relied is enumerated in the legislative history. Second, while we agree that, since all boats have blind spots, Congress could not have intended that the mere presence of a blind spot would serve as a condition automatically requiring an additional lookout, we see nothing incongruous about taking into consideration—as the district court did here—the size of the blind spot when conducting a Rule 5 analysis. *See, e.g.*, J.A. 1102 (explaining that the POOLE "had a significant blind spot" created by the eight barges it was pushing); J.A. 1103 (distinguishing the especially large blind spot as one "created by the eight-barge flotilla riding high in the water").

As further evidence that the court misapplied the proper legal standard under Rule 5, Vulcan points to the court's observation that, from the wheelhouse, the Captain and his deckhand were "attentive" and had "expansive," "all around views" of the flotilla's "operating environment." Appellant's Br. at 31 (citing J.A. 1084, 1097, 1102). These findings, Vulcan contends, establish that an additional lookout was unnecessary, because the tug's two lookouts "would have seen any vessel that was displaying proper lights" that evening. *Id.* Relatedly, Vulcan argues that the purpose of Rule 5 is to avoid the "risk of collision." *Id.* As such, Vulcan contends, the duty imposed on the POOLE by Rule 5 was "to keep a lookout to see the other vessel well *before* it got into the blind spot" and created a risk of collision. *Id.* (emphasis in the original). According to Vulcan, the district court's fact findings established that the tug's two lookouts were properly posted and would have seen any properly-lit vessel long before it passed into the tug's blind spot and created a risk of collision, obviating the need for posting a lookout forward.

Vulcan's argument relies on an incomplete version of the facts. Additional fact findings made by the district court indicate the conditions were such that the two lookouts in the wheelhouse would not necessarily have seen Tango-2, or another vessel, before it passed into the tug's blind spot. Spe-

cifically, the court found that "the Captain's and his deck-hand's visions were impaired," not just by the significant blind spot created by the flotilla, but also by the fact that they were "negotiating a difficult turning maneuver with this large flotilla in a narrow channel on a dark night in choppy waters." J.A. 1103. Their impaired vision was evidenced by the "Captain [keeping] his searchlight activated for an extended period of time" and the fact that neither lookout "saw Tango-2, although they had no difficulty seeing Tango-1, Tango-3, Sierra Charlie, and what turned out to be Sierra Bravo, which they thought was a fishing vessel." *Id.* With their vision impaired, the tug's lookouts would not have necessarily seen a properly-lit vessel before it passed into the tug's blind spot.[5]

Finally, Vulcan challenges the district court's application of Rule 5 by asserting that the court's fact findings prove a lookout forward would not have served to limit the risk of collision in this instance. Vulcan points to the court's observation that "a lookout stationed at the bow of the forward barge probably could not have warned the Captain in time to change his course." J.A. 1103. This finding does not mean, as Vulcan suggests, that once the Tango-2 had passed into the blind spot, "it was too late to avoid the collision." Appellant's Br. at 31. On the contrary, the district court explicitly found that, even if it was too late for the Captain to change course, a lookout

---

[5]Vulcan also contends that where, as here, "one ship has, by wrong maneuvers, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong and has not been maneuvered with perfect skill and presence of mind." Appellant's Br. at 33 (quoting *The Blue Jacket*, 144 U.S. 371, 392 (1892)). Vulcan reasons that once the Tango-2 passed into the tug's blind spot, the two vessels were *in extremis*, and Vulcan cannot be held liable for failing to avoid the collision at the last minute. Vulcan bases this argument on an erroneous belief that "[t]he court's finding of tug negligence was limited to the tug's inability to see the Tango-2 once it passed within the blind spot when the vessels were already *in extremis*." *Id.* at 34. Vulcan's argument, as explained above, ignores the district court's finding that the lookouts' vision was impaired by more than just the blind spot, and we therefore reject it.

forward still could have helped avoid the collision by "warn[-ing] Tango-2 and alert[ing] the Captain to sound his whistle (horn) as a further warning to Tango-2." J.A. 1103.

### 2.

In addition to challenging the district court's application of Rule 5, Vulcan attacks the court's negligence ruling on other grounds.

### i.

First, Vulcan contends that the court "made insufficient findings to support" its conclusion that Vulcan's failure to keep a proper lookout was a proximate cause of the collision. Appellant's Br. at 38. We find this argument unavailing because, at bottom, it is simply a disagreement with the district court's interpretation of the facts. Vulcan believes that, based on the record evidence and the court's findings, only one possible inference may be drawn: if the lookouts did not see Tango-2, it was because "Tango-2 was not properly displaying its lights." Appellant's Br. at 41. While another fact-finder might have reached the conclusion Vulcan advocates, the district court's determination to the contrary is not clearly erroneous. The court repeatedly expressed the view that the RHIBs' running lights were working properly. *See, e.g.*, J.A. 1095 (finding that, before departing Jordan Point, the Navy crews "verified that all lights on the boats—including an all-around white light mounted next to the radar dome on the aft mast, and a set of red and green running lights mounted forward in the RHIBs—were functioning properly"). We find that there was sufficient evidence from which the court could conclude that the boats were properly lit and that any alleged obstruction or malfunction of the lights did not contribute to the accident.

### ii.

Vulcan next argues that the district court erred by failing to apply an adverse inference against the government for its

alleged destruction of evidence. Vulcan specifically claims that the Coast Guard improperly removed the light bulbs from Tango-2's red and green running lights during its investigation of the accident. Those bulbs, according to Vulcan, were "the only evidence that could show whether Tango-2's lights conformed to Inland Rule 22(c)." Appellant's Br. at 45.

The application of an adverse inference "requires a showing that the party knew the evidence was relevant to some issue at trial and that his *willful conduct* resulted in its loss or destruction." *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004) (internal quotations omitted) (emphasis added). The district court's refusal to apply the inference "must stand unless it was an abuse of [its] 'broad discretion' in this regard." *Id.* (quoting *Cole v. Keller Indus., Inc.*, 132 F.3d 1044, 1046-47 (4th Cir. 1998)).

Here, the district court found "no evidence of spoliation of the evidence on the part of the Navy." J.A. 1073. In so finding, the court did not abuse its broad discretion. Record evidence established that the Coast Guard inspectors, not Navy personnel, removed the bulbs, and that the Navy personnel did not have control over the Coast Guard inspectors. This fact supports the conclusion that the loss or destruction of evidence was not the result of the Navy's willful conduct. *See Hodge*, 360 F.3d at 450; *see also Norfolk and Western Ry. Co. v. Transp. Commc'ns*, 17 F.3d 696, 702 (4th Cir. 1994) (explaining that an adverse inference is properly drawn "against a party who fails to come forward with relevant evidence within its control"); *Beaven v. U.S. Dept. of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (stating that a party seeking an adverse inference instruction must establish, among other things, that the destruction of evidence was caused by "the party having control over the evidence").

iii.

Finally, Vulcan maintains that the court did not properly apply the *Pennsylvania* rule. The *Pennsylvania* rule requires

that, in order to avoid liability, a vessel that violates "a statutory rule intended to prevent collisions" must prove that the violation could not have contributed to the collision. *The Pennsylvania*, 86 U.S. 125, 136 (1874); *see also Evergreen Int'l, S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 310 (4th Cir. 2008).

Vulcan argues that the *Pennsylvania* rule should have been applied against the government with regard to its alleged violation of Inland Rule 23. It specifically asserts that the court found "the Tango-2's white light was partially obstructed" in violation of Inland Rule 23, and that, under the *Pennsylvania* rule, the Navy's statutory violation required the district court to shift the burden to the United States to prove that the obstructed light could not have played any role in the collision. Appellant's Br. at 42. Contrary to Vulcan's characterization, however, at several points in the record, the district court explicitly found that the RHIB's running lights were properly lit, did not suffer from any "impairment," and were not a factor in the collision. *See* J.A. 1035, 1053-54, 1095. We therefore see no reason to alter the court's apportionment of fault determination. *Cf. Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 813 F.2d 634, 638 (4th Cir. 1987) (holding that, because the district court found that the vessel's alleged statutory violation "could not have been a contributing cause to the collision," consideration of that alleged violation when apportioning fault would be "a mistake of law").[6]

---

[6]Vulcan further asserts that the district court erred by requiring it to prove, pursuant to the *Pennsylvania* rule, that its failure to post a lookout could not have been a contributing cause of the collision. It specifically contends that the *Pennsylvania* rule applies "only to violations of statutes that delineate a clear legal duty," and because the duty to keep a proper lookout "calls for the exercise of professional judgment and assessment, Rule 5 should not be subject to the *Pennsylvania* presumption." Appellant's Br. at 38. It is not apparent to us, however, that the district court required Vulcan to prove that the failure to post an additional lookout contributed to the collision. Rather, the court simply found that various "factors indicate[d] that a lookout [wa]s required," and that Vulcan presented

In sum, to the extent Vulcan's appeal challenges the district court's application of the legal standard articulated by Rule 5, the court's oral and written decisions evince that it both understood and properly applied the appropriate standard. The application of that standard required the court to make findings of fact, none of which were clearly erroneous. We find Vulcan's additional arguments related to causation, spoliation of evidence, and application of the *Pennsylvania* rule similarly unavailing. We therefore decline to disturb the district court's findings as to liability for the collision and apportionment of fault.

## B.

We next consider Vulcan's challenge to the district court's dismissal of its contribution claim for lack of subject matter jurisdiction. The district court found that the *Feres-Stencel Aero* doctrine applies to Vulcan's action and bars its attempt to obtain contribution from the United States for damages as to which the government has not waived its sovereign immunity. We review de novo a district court's dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction. *Welch v. United States*, 409 F.3d 646, 650 (4th Cir. 2005).

By way of background, the *Feres-Stencel Aero* doctrine arises in the context of the United States as a sovereign. It is well established that the United States cannot be held liable in tort unless a claimant demonstrates that his right to sue falls within the terms of a waiver of sovereign immunity. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983); *Randall v. United States*, 95 F.3d 339, 345 (4th Cir. 1996).

no evidence in response "to suggest that a third individual could not be posted." J.A. 1103. But even if the district court did impose the burden of proof on Vulcan, under our precedent, the *Pennsylvania* rule applies equally to a Rule 5 violation, *see Yarmouth Sea Prods., Ltd. v. Scully*, 131 F.3d 389, 394 (4th Cir. 1997), and application of the rule here is not error.

Vulcan filed its third-party complaint against the United States under the Public Vessels Act ("PVA"), 46 U.S.C. §§ 31101-13, and the Suits in Admiralty Act ("SAA"), 46 U.S.C. §§ 30901-30918. These provisions waive the government's sovereign immunity "for causes of action arising out of the operation of vessels owned by or operated for the United States." *Manuel v. United States*, 50 F.3d 1253, 1255 (4th Cir. 1995); *see also* 46 U.S.C. § 31102 (providing that "a civil action in personam in admiralty may be brought . . . against the United States for . . . damages caused by a public vessel of the United States"); *id.* § 30903 (providing that "a civil action in admiralty in personam may be brought against the United States" for a case involving a privately owned vessel). As the Supreme Court explained in *Weyerhauser S.S. Co. v. United States*, 372 U.S. 597 (1963), the PVA "was intended to impose on the United States the same liability (apart from seizure or arrest under a libel *in rem*) as is imposed by the admiralty law on the private shipowner . . . ." *Id.* at 600.

However, while the PVA and SAA establish a broad waiver of sovereign immunity for admiralty-related claims against the United States, this waiver is not without limits. One such limit was created by *Feres v. United States*, in which the Supreme Court barred tort claims against the United States brought by servicemembers for injuries that occur "incident to service."[7] *Feres*, 340 U.S. at 146; *see also United States v.*

---

[7]The claimant in *Feres* sought recovery from the United States under the Federal Tort Claims Act ("FTCA"). The FTCA effects a limited waiver of the United States' sovereign immunity for claims involving "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). This court and others have since found that, in addition to barring suits brought pursuant to the FTCA, *Feres* applies equally to admiralty tort claims brought under the SAA and the PVA by servicemen injured while on duty. *See, e.g.*, *Blakey v. U.S.S. Iowa*, 991 F.2d 148, 151 (4th Cir. 1993); *Potts v. United States*, 723 F.2d 20, 21-22 (6th Cir. 1983); *Cusanelli v. Klaver*, 698 F.2d 82, 85 (2d Cir. 1983); *Charland v. United States*, 615 F.2d 508, 509 (9th Cir. 1980).

*Johnson*, 481 U.S. 681, 687 (1987) (observing that "the *Feres* doctrine has been applied consistently to bar all suits on behalf of service members against the Government based upon service-related injuries").

*Feres*'s holding was later extended to bar third-party suits against the government seeking indemnification for damages owed to servicemembers or their estates. In *Stencel Aero*, a National Guard officer suffered injuries when his ejection equipment on a military aircraft malfunctioned during an in-flight emergency. 431 U.S. at 666. The officer sued both Stencel Aero Engineering Corporation ("Stencel Aero"), as the manufacturer of the ejection equipment, and the United States for damages. *Id.* at 668. Stencel Aero, in turn, sought indemnity from the United States. *Id.* The Court concluded that "the right of a third party to recover in an indemnity action against the United States . . . must be held limited by the rationale of *Feres* where the injured party is a serviceman." *Id.* at 674.

The *Stencel Aero* Court offered three rationales for preserving the United States' immunity to tort actions involving injuries to military personnel, whether brought by the soldier directly or by a third party. First, the relationship between the government and its military personnel is "distinctively federal in character" and requires a uniform federal remedy that does not vary upon the situs of the incident. *Id.* at 671. Second, Congress created a "generous military compensation scheme" under the Veterans' Benefits Act that provides a "swift, efficient remedy for the injured serviceman" while establishing an "upper limit of liability for the Government"—a scheme whose purpose would be frustrated by allowing third-party claims for contribution. *Id.* at 672-73. Third, litigation over whether one servicemember negligently harmed another would have negative effects on military discipline, because the trial would "involve second-guessing military orders, and would often require members of the Armed Services to testify in court as to each other's decisions and actions." *Id.* at 673.

The government argues that *Feres* and *Stencel Aero* control here. It places particular emphasis on the "military discipline" rationale in arguing for the application of the *Feres-Stencel Aero* doctrine to all suits involving servicemen injured incident to service, including suits brought in admiralty.

Vulcan, on the other hand, relies on our precedent in *Ionian Glow* for its argument that *Feres-Stencel Aero* does not apply in this context. *Ionian Glow* allowed a private vessel owner to recover from the government for payments it made to three servicemen injured in a mutual fault collision. According to Vulcan, we thereby carved out an exception to *Feres-Stencel Aero* that recognizes the unique character of accidents in admiralty.

The interplay between the *Feres-Stencel Aero* doctrine and *Ionian Glow* is at the heart of this appeal. The context of our jurisprudence leading up to *Ionian Glow* and Supreme Court precedent since that decision informs our analysis.

1.

We turn first to a brief examination of the line of cases leading up to this court's decision in *Ionian Glow*. Damages in maritime collisions were traditionally apportioned according to the so-called divided damages rule. Under this rule, the percentage of fault was not litigated: each party to the collision "recover[ed] from the other one-half of its provable damages and court costs." *Weyerhaeuser S.S. Co.*, 372 U.S. at 598, 600.

In *Weyerhaeuser*, a collision between a dredge owned by the United States and a vessel owned by Weyerhaeuser resulted in injury to a civilian government employee onboard the dredge. The employee recovered compensation from the government under the Federal Employees' Compensation Act ("FECA"), and tort damages from Weyerhaeuser. Weyerhaeuser filed a third-party suit seeking contribution

from the government under the divided damages rule for the government's share of the employee's tort recovery.

The government challenged Weyerhaeuser's inclusion of any part of the tort damages paid to the employee on the ground that FECA's exclusive liability provision, 5 U.S.C. § 8116(c), prevented the employee from suing the government directly. By its express terms, § 8116(c) prohibits actions against the United States by an "employee, his legal representative, spouse, dependents, next of kin [or] any other person otherwise entitled to recover damages from the United States . . . because of the [employee's] injury or death." Third parties such as Weyerhaeuser, the government argued, were included within the general phrase "anyone otherwise entitled to recover damages." *Id.* at 600.

The Supreme Court rejected this argument and concluded that FECA's exclusive liability provision had been intended to govern only the relationship "between the Government on the one hand and its employees and their representatives or dependents on the other." *Id.* at 601. It held that the traditional admiralty divided damages rule allowed Weyerhaeuser to include in its provable damages a settlement it paid to the employee. The Court based its ruling on the fact that the parties' relationship was governed not by contract or FECA's exclusive liability provision, but instead by the divided damages rule: "There is no evidence whatever that Congress was concerned with the rights of unrelated third parties, much less of any purpose to disturb settled doctrines of admiralty law affecting the mutual rights and liabilities of private shipowners in collision cases." *Id.* at 601.

Twelve years later, in *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397 (1975), the Supreme Court rejected the long-standing divided damages rule in favor of the modern comparative fault approach, *id.* at 410-11. The Court found the traditional rule "unnecessarily crude and inequitable" when the fault of the two parties "is markedly dispropor-

tionate," given that in such cases, "it is in the interest of the slightly negligent party to litigate the controversy in the hope . . . a court [may] absolve it of all liability." *Id.* at 407-08.

Several years after the Supreme Court abrogated the divided damages rule, this court decided *Ionian Glow*. There, the M/V LIGHT, owned by Ionian Glow, collided with the U.S.S. FRANCIS MARION, which resulted in personal injuries to three sailors aboard the Navy vessel. 670 F.2d at 463. Ionian Glow brought suit against the United States "seeking apportionment of damages under the divided damage rule in mutual fault collision cases in admiralty."[8] *Id.* The United States stipulated its degree of fault and agreed to pay 35 percent of Ionian Glow's provable damages. Consequently, the sole issue for the court's determination was "what damages were provable." *Id.* The government argued that "to require it to pay 35 percent of Ionian Glow's settlement with the servicemen" would run afoul of the *Feres-Stencel Aero* doctrine by "subject[ing] it to indirect liability on a claim that could not directly be brought against the government." *Id.* This court rejected the government's argument, holding that "[n]othing in *Feres*, *Stencel Aero* or the cases that follow" prevented Ionian Glow from including in its provable damages the settlement claims it paid out to the injured servicemen. *Id.* at 464. It declared itself bound by *Weyerhaeuser*, because there, the Supreme Court held that the long-standing divided damages rule "must prevail over a statutory provision which . . . limited the liability of one of the shipowners." *Id.* (quoting *Weyerhaeuser*, 372 U.S. at 603).

---

[8]In *Ionian Glow*, this court did not discuss the demise of the divided damages rule announced earlier in *Reliable Transfer* or that decision's impact, if any, on the Supreme Court's earlier *Weyerhaeuser* holding. The government contends, therefore, that "*Ionian Glow*'s reliance on *Weyerhaeuser* and the divided damages rule renders it inapposite to the case at bar," because "[a]fter *Reliable Transfer*, Vulcan can no longer invoke the 'full scope' of that rule as the basis for its recovery from the United States." Government's Br. at 29-30. We need not address the government's argument on this point, however, because the Supreme Court's *Lockheed* opinion, decided after *Ionian Glow*, resolves the issue before us.

In so holding, this court found the admiralty/non-admiralty distinction determinative. It reasoned that, had Ionian Glow's suit been an indemnification action brought under the FTCA, it would be barred by the *Feres-Stencel Aero* doctrine. However, because it was a mutual fault collision case in admiralty, the *Weyerhaeuser* rule applied. *Id.*

2.

Approximately a year after *Ionian Glow*, the Supreme Court decided *Lockheed Aircraft Corp. v. United States*, 460 U.S. 190 (1983), which again addressed the issue of whether a third party may seek indemnity from the government for its tort liability to a federal employee. In *Lockheed*, a civilian employee of the United States Navy died in the crash of an aircraft operated by the government and manufactured by Lockheed. The decedent's survivors received death benefits under FECA and filed a tort action against Lockheed, which in turn impleaded the United States, asserting a right to indemnification under the FTCA. *Id.* at 192. The Supreme Court held, just as it had twenty years prior in *Weyerhaeuser*, that Lockheed's indemnity claim against the United States was not barred by FECA's exclusive liability provision, because that provision did not apply to claims against the United States by non-employees and non-dependants like Lockheed. *Id.* at 196.

Importantly, in allowing Lockheed's indemnification claim, the Supreme Court rejected the government's attempt to distinguish its earlier *Weyerhaeuser* ruling from the case before it on the basis that the earlier decision arose in the admiralty context but *Lockheed* did not. It reasoned that, "as in *Weyerhaeuser*, a third party has been forced to pay tort damages for . . . a federal employee covered by FECA, and the third party [sought] to recover a portion of its payment." *Lockheed*, 460 U.S. at 196. Although the basis for the suit against the United States in *Lockheed* was the FTCA as opposed to the PVA in *Weyerhaeuser*, the Court found "that

difference . . . irrelevant" because (1) the FTCA and the PVA both permit, "on essentially the same terms," an action to recover damages against the United States, and (2) Congress intended FECA's exclusive liability provision "to apply to suits under both Acts without distinction." *Id.* at 198.

While rejecting the relevance of any admiralty/non-admiralty distinction, the *Lockheed* Court reaffirmed the continuing vitality of the *Feres-Stencel Aero* doctrine in suits involving military affairs. In response to the dissent's view that *Stencel Aero* involved a similar indemnity claim, the majority distinguished *Stencel Aero* as turning "primarily on the *military nature* of the action" and raising the question of "whether the Government's waiver of sovereign immunity in the [FTCA] applied to an indemnity action based on an injury to a *serviceman*." *Id.* at 198 n.8 (emphasis added). That issue was not present in *Lockheed*, which involved the death of a civilian employee, as it was "clear that the Government ha[d] waived its sovereign immunity" in FECA for such non-military actions. *Id.*

The *Lockheed* Court's emphasis on the "military nature of the action" reinforces its repeated citation to the "military discipline" rationale as the primary support for *Feres* and *Stencel Aero*. As outlined in *United States v. Shearer*, 473 U.S. 52 (1985),

> [a]lthough the Court in *Feres* based its decision on several grounds . . . "*Feres* seems best explained by the 'peculiar and special relationship of the soldier to his superior, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty.'"

*Id.* at 57 (quoting *United States v. Muniz*, 374 U.S. 150, 162 (1963)); *see also id.* at 58 n.4 (describing *Feres*'s other two

rationales as "no longer controlling"); *Chappell v. Wallace*, 462 U.S. 296, 299 (1983). In its most recent decision applying the *Feres-Stencel Aero* doctrine, the Court reiterated that the concern for interference with military discipline lies "at the heart of the *Feres* doctrine" and distinguishes suits brought against the United States by servicemembers injured in the course of military service from those brought by civilian employees. *Johnson*, 481 U.S. at 692 ("We affirm the holding of *Feres* that 'the Government is not liable . . . for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service.'") (quoting *Feres*, 340 U.S. at 146).

3.

In light of the Supreme Court's *Lockheed* decision and its subsequent emphasis on the military discipline rationale supporting the *Feres-Stencel Aero* doctrine, we agree with the district court that *Ionian Glow* does not control our analysis. We reach that conclusion for several reasons.

First, as the district court notes, this case is factually distinguishable from *Ionian Glow*. Unlike here, the government in that case stipulated to its degree of fault. Despite Vulcan's protestations to the contrary, this distinction matters: that stipulation avoided litigating the United States' liability in court. As the district court explained, "there was no need [in *Ionian Glow*] for a trial to determine the Navy's negligence, there was no need for servicemen to testify against their colleagues or superiors, and there was no threat of an adverse effect on military discipline because of such a trial or testimony." J.A. 1111.

By contrast, the litigation of liability here resulted in numerous Navy witnesses being called into court to testify "about their own actions and those of fellow servicemen." J.A. 1110-11. This is exactly what the *Feres-Stencel Aero* doctrine was designed to avoid. *See Stencel Aero*, 431 U.S. at

673 (explaining that, whether a suit is brought by the service-man directly or by a third party, "at issue would be the degree of fault, if any, on the part of the Government's agents and the effect upon the serviceman's safety," and the trial necessarily would "involve second-guessing military orders, and would often require members of the Armed Services to testify in court as to each other's decisions and actions").

Vulcan counters that the government in *Ionian Glow* stipulated its percentage of fault only after numerous depositions were taken of Navy officers and personnel at the discovery stage. "If requiring military witnesses to testify about Navy negligence undermines military discipline," Vulcan argues, "then that factor was surely present in *Ionian Glow*." Appellant's Br. at 21.

Vulcan's argument represents only a partial understanding of the "military discipline" rationale. The Supreme Court is concerned not only with servicemembers testifying as to each other's decisions and their superiors' orders, but also with a civilian court sitting in judgment of military decisions. *See Shearer*, 473 U.S. at 58 (explaining that allowing tort suits to reach the trial stage means that "commanding officers would have to stand prepared to *convince a civilian court* of the wisdom of a wide range of military and disciplinary decisions," including the sorts of "'complex, subtle, and professional decisions as to the composition, training, . . . and control of a military force [that] are essentially professional military judgments'" (emphasis added) (quoting *Chappell*, 462 U.S. at 302)); *see also Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953) ("The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."). While there was indeed discovery in *Ionian Glow* over the degree of fault, the government's stipulation nonetheless prevented the issue of its liability from being litigated *in*

*court*. The only question before the district court in *Ionian Glow* was which damages qualified for apportionment—notably, the court was never called on to judge the propriety or prudence of military decisions.

As we have noted, we find it significant that Supreme Court precedent since *Ionian Glow* has recognized the primacy of military discipline as the rationale underlying *Feres-Stencel Aero*. *See, e.g.*, *Shearer*, 473 U.S. at 57, 58 n.4. We therefore agree with the district court's decision not to extend *Ionian Glow* beyond its facts.

The Supreme Court has provided additional substantive guidance as well. Its decision in *Lockheed* clarifies that whether an accident occurs in admiralty is not the overriding factor that determines whether or not sovereign immunity bars the action. Rather, the focus is on the military nature of cases to which *Feres-Stencel Aero* applies.

As a practical matter, focusing on the nature of the action as opposed to its situs makes particular sense in the context of a military with several branches. Refusing to apply *Feres-Stencel Aero* in admiralty cases alone would have the arbitrary consequence of bearing more harshly on the United States Navy and Marines in comparison to their sister branches of the armed forces, who primarily engage in non-naval activities.

For these reasons, we find that the *Feres-Stencel Aero* doctrine applies to the present dispute involving a serviceman killed incident to service. To the extent that *Ionian Glow* relied on the distinctive nature of accidents occurring in the admiralty context, the Supreme Court's subsequent decision in *Lockheed* instructs that the "military nature" of the tort action is the more compelling inquiry. Furthermore, unlike in *Ionian Glow*, the "military discipline" rationale underlying the *Feres-Stencel Aero* doctrine is fully implicated here and counsels in favor of finding that the government has not waived its

sovereign immunity. We therefore affirm the district court's order granting the government's motion to dismiss Vulcan's third-party claim against the United States due to lack of subject matter jurisdiction.

## III.

For the foregoing reasons, the district court's judgment is

*AFFIRMED*.